**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DEANO GOLDEN, *et al* | ) | Case No.: 10-cv-7673 |
| Plaintiffs, | ) | |
| | ) | Judge: Matthew F. Kennelly |
| v. | ) | |
| | ) | Magistrate Judge: Michael T. Mason |
| WORLD SECURITY BUREAU, *et al* | ) | |
| Defendants. | ) | JURY DEMANDED |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DEANO GOLDEN, *et al* | ) | Case No.: 10-cv-7673 |
|     Plaintiffs, | ) | |
| | ) | Judge: Matthew F. Kennelly |
|     v. | ) | |
| | ) | Magistrate Judge: Michael T. Mason |
| WORLD SECURITY BUREAU, *et al* | ) | |
|     Defendants. | ) | JURY DEMANDED |

## TABLE OF CONTENTS

**I.**     **FACTUAL BACKGROUND** ............................................................................ 1

**II.**     **SUMMARY JUDGMENT STANDARD** ........................................................ 7

**III.**     **ARGUMENT** ...................................................................................................... 7

    **A.**     **DEFENDANTS' STATEMENTS NUMBERED
81 THROUGH 156 SHOULD BE STRICKEN AS
VIOLATIVE OF LOCAL RULE 56.1(A)(3)** ........................................ 7

    **B.**     **WSB IS STRICTLY LIABLE FOR GROVES
RACIAL HARASSMENT** ..................................................................... 7

        **1.**     **Groves Subjected Plaintiffs to Unwelcome
Racial Harassment Based on Their Race that
Unreasonably Interfered with Their Work
Performance and Work Environment** ...................................... 8

        **2.**     **WSB is Strictly Liable for Groves' Offensive Actions** ............ 10

        **3.**     **Assuming, *Arguendo,* Plaintiffs did not Suffer a
Tangible Employment Action, WSB has Failed to
Meet Either Prong of the Affirmative Defense** ....................... 11

            **(i)**     **WSB Failed to Exercise Reasonable Care to
Prevent and Correct any Harassing Conduct
in the Workplace** ........................................................... 12

            **(ii)**     **Plaintiffs Did Not Unreasonably Fail to Take**

Advantages of Corrective Opportunities
to Avoid Harm ............................................... 14

C.      WSB DISCRIMINATED IN PROMOTING
        AFRICAN-AMERICANS ...................................... 15

D.      GROVES AND I. KISWANI ARE INDIVIDUALLY LIABLE ...................... 16

E.      WSB RETALIATED AGAINST PLAINTIFFS FOR
        FILING CHARGES OF DISCRIMINATION ..................... 16

        1.      Plaintiffs Suffered Adverse Employment Actions ................. 16

        2.      There is a Causal Connection Between Plaintiffs
                Protected Activity and Adverse Employment Action ........... 18

F.      WSB CONSTRUCTIVELY DISCHARGED
        GOLDEN AND MOORE ...................................... 20

G.      PLAINTIFFS TORT CLAIMS ARE NOT PREEMPTED ............... 21

H.      WSB VIOLATED THE IMWL AND FLSA ..................... 23

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DEANO GOLDEN, *et al* | ) | Case No.: 10-cv-7673 |
| Plaintiffs, | ) | |
| | ) | Judge: Matthew F. Kennelly |
| v. | ) | |
| | ) | Magistrate Judge: Michael T. Mason |
| WORLD SECURITY BUREAU, *et al* | ) | |
| Defendants. | ) | JURY DEMANDED |

## TABLE OF AUTHORITIES

### I.   STATUTES AND RULES

Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e ..................................................... 11

The Civil Rights Act of 1866, 42 U.S.C. § 1981 ............................................................ 11

Federal Rules of Civil Procedure Rule 56(c) ................................................................ 7

Northern District of Illinois Local Rule 51.(a)(3) ...................................................... 7, 8

Illinois Human Rights Act, 775 ILCS 5/7A-102(A)(3)(3).............................................. 22

Illinois Minimum Wage Law, 820 ILCS 105/12(a) ........................................................ 24

Illinois Personnel Records Review Act, 820 ILCS 40/ ................................................... 7

### II.   CASE LAW

*CBOCS West, Inc., v. Humphries,* 188 S. Ct. 1951, 1961 (2008).......................................16

*Anderson v. Mt. Clemons Pottery Co.,* 328 U.S. 680, 688 (1946) .................................. 24

*Burlington Northern & Santa Fe R.R. Co., v. White,* 548 U.S. 53, 67-68 (2006) ..................... 16, 22

*Ellerth v. Burlington Indus,* 524 U.S. 742 (1996) ...................................................... 8, 11

*Faragher v. City of Boca Raton,* 524 U.S. 775, 807 (1998) ............................................ 11

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) ...................................7

-iv-

*Musikiwamba v. ESSI, Inc.,* 128 S.Ct. 1951, 1981 (2008) ..................................................... 16

*Oncale v. Sundowner Offshore Serv's Inc.,* 573 U.S. 75, 78 (1998) ...................................... 8

*Pa. St. Police v. Suders,* 542 U.S. 129 (2004) ............................................................. 11, 16, 21

*EEOC v. Mgmt. Hosp. of Racine*, 666 F.3d 422, 436 (7th Cir. 2012) ...................................... 12, 13

*EEOC v. V & J Foods, Inc.,* 507 F.3d 575, 578 (7th Cir. 2007) ............................................ 12

*Abdullahi v. City of Madison,* 423 F.3d 763, 773 (7th Cir. 2005) ......................................... 6

*Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 912 (7th Cir.2010) ................................. 9

*Courtney v. Biosound, Inc.* 42 F.3d 414, 423 (7th Cir. 1994) .............................................. 7

*Ellis v. CCA of Tenn, LLC,* 650 F.3d 640, 648 (7th Cir. 2011) ............................................ 10

*Genry v. Export Packaging Co.,* 238 F.3d 842, 850 (7th Cir. 2001) ....................................... 12

*Hardin v. S.C. Johnson,* 167 F.3d 340, 345 (7th Cir. 1999) ............................................... 9

*Howland v. Kilquist*, 833 F.2d 639, 642 (7th Cir. 1987) ................................................... 7

*Kampmier v. Emeritus Corp.,* 472 F.3d 930, 940 (7th Cir. 2007) .......................................... 10

*Jackson v. County of Racine,* 474 F.3d 493, 500 (7th Cir. 2007) ......................................... 8, 9

*Patton v. Keystone RV,* 455 F.3d 812 (7th Cir. 2006) ..................................................... 11, 16

*Robinson v. Sappington,* 351 F.3d 317 (7th Cir. 2003) .................................................... 8

*Bailey v. Binyon,* 583 F.Supp.923 (N.D. Ill.) ............................................................ 9

*Green v. Harrah's Ill. Corp,* 2004WL1102272 (N.D. Ill. 2004) ............................................ 8

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DEANO GOLDEN, *et al* | ) | Case No.: 10-cv-7673 |
| Plaintiffs, | ) | |
| | ) | Judge: Matthew F. Kennelly |
| v. | ) | |
| | ) | Magistrate Judge: Michael T. Mason |
| WORLD SECURITY BUREAU, *et al* | ) | |
| Defendants. | ) | JURY DEMANDED |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

World Security Bureau, Inc, ("WSB"), Glendon Groves ("Groves") and Ibrihim Kiswani's

("I. Kiswani")(collectively "Defendants") motion for summary judgment should be denied in its

entirety as there are numerous genuine issues of material fact, fabrications and contradictions calling

into question the truth and veracity of Defendants' position, and independent third party witnesses

corroborating Plaintiffs' version of events.

**I.     FACTUAL BACKGROUND**

WSB hired Glendon Groves ("Groves") to work as an armed security guard in October 2009.

(Defendants' Statement of Material Facts, ¶ 1, "D.SOF _."). Within only a few months, Groves, who

WSB had already promoted to a Shift Supervisor, provided insight into his racially offensive mind

set. (D.SOF ¶ 1; Plaintiffs' Statement of Additional Facts ¶ 12, "PSF ¶_."). In January 2010, Groves

informed a fellow employee named Antonio Scott ("Scott"), *inter alia,* that Groves has "black people

in check," and he is a "real German, a real Nazi." (PSF ¶ 13). Scott immediately informed his Field

Supervisor, Danny Dominguez ("Dominguez"). (*Id*). Dominguez, like all Field Supervisors, is a

proper person to go to with a complaint of harassment or discrimination. (D. SOF ¶ 10; Def. Ex. C).

In response to Scott's complaint, WSB did nothing and did not conduct an investigation.  (PSF ¶ 13).

1

Shortly after Scott's complaint, Plaintiff Phylon Moore ("Moore"), African-American, [D.70 ¶ 8] overheard Groves say to Moore, "look at this monkey." (PSF ¶ 1). Appalled, Moore immediately notified Field Supervisor, Serfin Herrera ("Herrera") of Groves' offensive comment. (*Id*). Instead of conducting an investigation, WSB again promoted Groves to a Site Supervisor and transferred both him and Moore to the Henry Horner Homes. (D.SOF ¶ 21; PSF ¶ 1). Upon learning that WSB promoted Groves to be his supervisor, Moore again called Herrera to complaint that WSB promoted and transferred Groves and him to the exact same site. (PSF ¶ 1). Groves admitted that Field Supervisor Israel Ortiz ("Ortiz") questioned him about calling Moore a "monkey" and WSB knew of the allegation. (PSF ¶ 2). Despite its admitted knowledge of Moore's complaint, WSB again did nothing and conducted no investigation. (*Id*; *See* Plaintiffs' Response to D.SOF ¶ 4).

In late February or early March 2010 when WSB promoted and transferred Groves to the Henry Horner site, he also became Plaintiff Latrice Reed's ("Reed"), African-American, direct supervisor. ([D.70 ¶ 7]; PSF ¶ 3). Within days of his arrival, Reed heard Groves make derogatory remarks to the African-American residents at Henry Horner. These remarks included telling tenants to "sit their black-ass down," and refer to them as "black-ass boys," "porch-monkey," and "little niggers." (PSF ¶¶ 3, 4). Groves also subjected Reed to racially offensive stereotypes telling her that all African-Americans "are on welfare, they don't do nothing . . . don't [sic] none of them work." (PSF ¶ 3). On those days that Reed did not work with Groves who instead worked with Moore, Moore also heard Groves, on a daily basis, tell the African-American tenants to "sit your black ass down," and called them "black-asses." (PSF ¶ 4).

In addition to Reed confronting Groves (PSF ¶ 3), in April or May 2010, Reed also complained to Herrera. Reed informed Herrera that Groves called the African-American tenants

2

"mother fuckers," "black-assses," and "porch monkeys." (PSF ¶ 5). Reed informed Herrera that she did not feel safe around Groves and requested WSB move her. (*Id*). In response, Herrera informed Reed that Groves was "digging his own grave," however, WSB did not conduct an investigation and did not discipline Groves. (PSF ¶ 5). On another occasion, in the Spring 2010, Reed heard Groves tell Victor Hernandez ("Hernandez") that he "works with a bunch of niggers." (PSF ¶ 6). Reed again complained to Herrera who again did nothing. PSF ¶¶ 6, 12).

During the Spring of 2010, while Reed continued to complain to Herrera and Field Supervisor John Henley ("Henley"), about Groves' inappropriate and racially offensive comments, tenants also began to complain to Moore, Reed, and Plaintiff Deano Golden ("Golden"), African American [D.70],who worked the overnight shift. (D.SOF ¶ 57; PSF ¶¶ 7, 18; Pl. Ex. A). For example, Sheila Turner ("Turner") who was a tenant at Henry Horner and also worked as "Tenant Patrol" alongside Groves, complained that, among other things, Groves used the word "nigger," and that he possessed a Confederate "Nazi" flag on his firearm and inside his vehicle parked on the premises. (PSF ¶ 7, 9; Pl. Ex. A). On one occasion, Turner complained about Groves' offensive comments to Eddie Kiswani ("E. Kiswani"), who works for WSB and is the brother of I. Kiswani, WSB's Director of Operations and Mike Kiswani ("M. Kiswani"), WSB's Director of Discipline. (Exhibit A; D.SOF ¶¶ 2, 3). WSB also did nothing in response to Turner's complaints which ultimately led her to quit Tenant Patrol due to Groves behavior. (PSF ¶ 10; Pl. Ex. A).

In approximately the Summer of 2010, upon receiving one of Turner's complained that Groves possessed a Confederate "Nazi" flag on his pistol and inside of his vehicle, Golden, Reed, and Moore each independently witnessed the offensive flag on Groves' loaded pistol and inside his vehicle. This offended, made nervous, and frightened Golden, Reed, and Moore. (Pl. Ex A; PSF ¶¶

7, 9). Around this same time, Golden wrote a statement outlining the different complaints that Turner made to him about Groves as well as the offensive flag. (PSF ¶ 10). Because Golden worked overnights, he placed this statement, as well as the other three he authored complaining of Groves, inside the Henry Horner mail envelope. (PSF ¶ 10). Unbeknownst to Golden, however, Groves had unbridled access to said mail envelope and is required to review its contents. (PSF ¶ 11).

During one of Reed's numerous complaints to Herrera, he informed her that WSB previously transferred Groves because he referred to guards as "niggers," and "black-asses." (PSF ¶ 12). Despite this, Groves continued to work as the Site Supervisor at Henry Horner when on or about September 9, 2010, Groves sent Hernandez a picture that depicted a KKK lynching through the use of a dark beer bottle hung by a noose with three lightly colored beer cans with KKK hoods with the caption "You cant keep the dark ones with the light ones anymore." (PSF ¶ 9; Pl. Ex. B; Pl. Ex C). Hernandez immediately reported the offensive picture to Henley. (PSF ¶ 9). Later that same night, Henley and Hernandez approached Golden. While in Henley's presence, Hernandez showed Golden the picture stating, "this is some bullshit," and that Hernandez was tired of Groves talking about "niggers" and "spics." (*Id*). At the conclusion of this meeting, Henley sent the offensive picture to Golden. (*Id.*; Pl. Ex. C).

On the morning of September 9, 2010, M. Kiswani and I. Ortiz met with Groves at the Henry Horner location to discuss the offensive picture. (D.SOF ¶ 31). As a result of this offensive picture, WSB did not discipline Groves and he remained the Site Supervisor at Henry Horner. WSB did not suspend Groves at all, let alone for "five days."[1] (PSF ¶ 23; Pl. Ex. F). WSB also did not reduce Groves' pay. (D.SOF ¶ 36; Pl. Ex. CC). Rather, Groves continued to work with full pay as a site-

---

[1] WSB's Employee Warning Report ("EWR") actually encompasses six days the 10th through the 15th.

supervisor for as much as an additional two weeks at Henry Horner. (PSF ¶¶ 19, 23; Pl. Ex. F; Pl. Ex. CC).[2] Groves also allegedly authored an "apology" letter on September 9, 2010 that he tendered to WSB. (PSF ¶ 22; Def. Ex. J). Like Groves' alleged Warning (EWR) for sending the picture, (Def. Ex. I), neither Groves nor anyone from WSB know when this "apology" was authored, contradict each other why it was written, do not know if it was distributed to employees, where it was tendered to WSB, when it was tendered to WSB, or even how it was tendered to WSB. (*Id*). At some point, WSB allegedly transferred Groves to the Washington Park site located at 35th and Giles and rewarded his behavior by scheduling him to work an additional 20 hours per week. (PSF ¶ 24).

In late September 2010, WSB temporarily laid off Reed for an unrelated incident involving a friend of Reed's who had committed suicide. (Def. Ex. V, 104; 106:6-13; 110). WSB informed Reed that it would be placing her at a new site in the coming weeks. (PSF ¶ 34). Reed's "laid-off" status is reflected in the EWR that WSB completed at that time. (PSF ¶ 34; Pl. Ex G).[3] At the time WSB temporarily laid-off Reed, it did not require her to turn in her TAN card, which is her license to carry a firearm for WSB, nor her company patches. (PSF ¶ 35). It is a state law that a terminated employee turn in her TAN card upon termination and company policy to do the same with an employee's patches. (Def. Ex. A, 100:24; 101:1-7 102:1-6).

On October 1, 2010, Golden, Reed, Hernandez, and Moore filed charges of discrimination with the EEOC. (D.SOF ¶ 40; [D.70, ¶ 61]). On October 5, 2010, the EEOC notified WSB of the Plaintiffs' charges. (Pl. Ex. E). On October 15, 2010, WSB cut Golden from a full-time employee

---

[2] WSB's own paystubs completely fly in the face of its argument that it suspended Groves.  See Pl. Ex. CC.

[3] Reed obtained this EWR in October 2010 pursuant to a personnel file request under the Illinois Personnel Records Review Act, 820 ILCS 40/.  (Exhibit H).

to a part-time employee. (PSF ¶¶ 27, 28). On this same date, WSB transferred Golden to a site which required a longer, more onerous commute. (P. SOF ¶ 27). At this time, WSB did not transfer any other employees from Henry Horner. (PSF ¶ 29).[4] While transferring and reducing Golden's schedule, WSB scheduled Groves to work sixty hours at the Washington Park location. (PSF ¶ 24). Knowing this as well WSB's failure to discipline Groves, Golden could not take it anymore and WSB constructively discharged his employment on October 15, 2010. (PSF ¶ 30).

On October 15, 2010, WSB also reduced Moore's and Hernandez's hours. (PSF ¶¶ 31-32). Moore did not seek a reduction in hours at this time and did not complete any paperwork requesting the same. (*Id*). The same day that Moore learned WSB cut his hours, Golden's and Hernadez's, Moore knew that with a newborn, he could not survive on the 32 hours per week that WSB now scheduled him for. (PSF ¶ 32). As a result, on that day, WSB constructively discharged Moore. (*Id.*).

In what WSB would have this Court believe another shocking coincidence, on October 15, 2010, as Reed retrieved her check and inquired about her future job placement WSB promised, WSB terminated her employment. (PSF ¶36). On that date, for the first time, WSB mandated Reed turn in her TAN card and patches. (P. SOF ¶¶ 35, 36). During the course of discovery, WSB produced another EWR for Reed which materially altered and whited-out the first EWR that indicated she had been temporarily "laid-off." (PSF ¶ 36). Even WSB's counsel expressed disbelief of such material alteration (Def. Ex. V, 200-01), and later offered an *ex post facto* explanation for WSB's attempt to distort and conceal the truth. (Pl. Ex. I).

---

[4] For multiple reasons discussed below, the fact that WSB does not maintain any old employee schedules is crucial to this case and inherently requires a finder of fact to draw on credibility determinations to reach a verdict. Credibility determinations, however, are improper at the summary judgment stage. *See Abdullahi v. City of Madison,* 423 F.3d 763, 773 (7th Cir. 2005).

During Plaintiffs' employment, I. Kiswani, who admittedly violates overtime law (Def. Ex. A, 135:7-24; 136:1-8), placed employees on a 1099 status in order to evade mandatory payroll taxes. (PSF ¶ 37). WSB does this by failing to report wages to the IDES. (PSF ¶ 37; Pl. Ex. Z). All employees, irrespective if they are classified as 1099 or W2, automatically have 30 minutes per day deducted from their paychecks irregardless if the worker takes a lunch or not. (*Id*). On several occasions, WSB deducted time from Plaintiffs pay for lunches they did not take. (*Id;* Pl. Ex. T).

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if when viewing all facts in the light most favorable to the non-moving party "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue of material fact such that the moving party is entitled to summary judgment as a matter of law." Fed.R.Civ.P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A genuine issue of material fact is one that is outcome determinative under the governing law. *Howland v. Kilquist*, 833 F.2d 639, 642 (7th Cir. 1987). The summary judgment standard is applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues." *Courtney v. Biosound, Inc.* 42 F.3d 414, 423 (7th Cir. 1994).

## III.  ARGUMENT

### A.  DEFENDANTS' STATEMENTS NUMBERED 81 THROUGH 156 SHOULD BE STRICKEN AS VIOLATIVE OF LOCAL RULE 56.1(A)(3)[5]

Local Rule 56.1(a)(3) states in relevant part that "Absent prior leave of court, a movant shall

---

[5] This Court should also strike any and all footnotes contained in Defendants' Statement of Material Facts as (1) they are violative of Local Rule 56.1(A)(3); and (2) are inherently difficult to respond to in accordance with Local Rule 56.1(B)(3). In addition, Plaintiffs request this Court strike paragraphs 16, 17, 45, and 79 as they contain inappropriate references, citation to inadmissible evidence, or are inherently vague and ambiguous hindering an adequate response.

not file more than 80 separately-numbered statements of undisputed material fact." In Defendants Statement of Facts, however, Defendants had 156 "statements of fact." At no time did Defendants seek leave to include additional statements of fact. Nonconformity with the Local Rules of the Court should not be without consequence. As such, this Court should strike statements numbered 81 through 156 as violative of Local Rule 56.1(a)(3) and refuse to consider any arguments in reliance on said facts. *See Green v. Harrah's Ill. Corp,* 2004WL1102272 (N.D. Ill. 2004)(striking and refusing to consider any statements in excess of the Court's standing order without prior leave).[6] (Pl. Ex. AA).

### B. WSB IS STRICTLY LIABLE FOR GROVES RACIAL HARASSMENT

In order to establish a *prima facie* case of racial harassment, Plaintiffs must show that they (1) were subjected to unwelcome racial harassment; (2) the harassment was based on their race; (3) the harassment unreasonably interfered with their work performance; and (4) there is a basis for employer liability. *Robinson v. Sappington,* 351 F.3d 317 (7th Cir. 2003). Where a tangible employment action results from the harassment, the company will be held strictly liable. *Ellerth v. Burlington Indus*, 524 U.S. 742 (1996). The work environment does not need to be "hellish" to constitute illegal harassment. *Jackson v. County of Racine,* 474 F.3d 493, 500 (7th Cir. 2007).

### 1. Groves Subjected Plaintiffs to Unwelcome Racial Harassment Based on Their Race that Unreasonably Interfered with Their Work Performance and Work Environment.

An employee is protected from harassment that is severe or pervasive enough as to alter the conditions of his employment. *Oncale v. Sundowner Offshore Serv's Inc.,* 573 U.S. 75, 78 (1998).

---

[6] As a result of this Court's Standing Order disfavoring independent motions to strike, Plaintiffs have contained all arguments in support of striking Defendants' violative statement of facts herein.

8

The court must consider all circumstances, including the "frequency of the discriminatory conduct, its severity; whether it is physically threatening or humiliating, or a mere offensive utterance. *Jackson,* 474 F.3d 493, 499 (7th Cir. 2007). A plaintiff may meet the second prong of his *prima facie* case by demonstrating that the harassment was overtly racial or tied to race. *Hardin v. S.C. Johnson,* 167 F.3d 340, 345 (7th Cir. 1999).

In this case, Reed personally overheard Groves say "little niggers," "black-asses," "porch monkeys," and "I work with a bunch of niggers," over 100 times. (PSF ¶ 3-4). *See Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 912 (7th Cir.2010) ("Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of the word "nigger" by a supervisor in the presence of his subordinates"); *Bailey v. Binyon,* 583 F.Supp.923 (N.D. Ill.) (holding that use of the word "nigger" one time may support a hostile work environment claim). In addition, Groves subjected Reed to stereotypical comments regarding African-Americans and welfare. (PSF ¶ 3). While enduring this, Reed also received complaints from tenants about Groves. (PSF ¶ 7). As if that was not enough, Reed witnessed Groves overtly display an offensive flag on his loaded weapon and in his vehicle. (PSF ¶ 7, 9). As Reed testified, due to this conduct, she was offended, frightened, and even requested a transfer. (PSF ¶ 5).

Within months of being employed at WSB, Groves called Moore a "monkey." (PSF ¶ 1-2). Even though Moore complained to WSB, this comment was not an isolated incident. Like Reed, Moore heard Groves use inappropriate and derogatory remarks, such as "black-ass" on a near daily basis. (P. SOF ¶ 4). Moore would also receive complaints from tenants about Groves. (Pl. Ex. A; PSF ¶ 7). Moore also witnessed Groves overtly display an offensive flag on his loaded weapon and in his vehicle. (PSF ¶ 7). Undoubtedly, Groves' conduct interfered with Moore's ability to do his job

9

as Moore was frightened, had sleepless nights, was uncomfortable and felt helpless. (PSF ¶ 14).

Golden also witnessed the offensive flag in Groves' vehicle and on Groves' loaded weapon which was overtly displayed for all the African-American residents of the Henry Horner Homes to see. (PSF ¶ 7; Pl. Ex. A). At the same time Groves displayed the offensive flag on his loaded deadly weapon, Golden also was receiving complaints about Groves from tenants. (*Id*). This led Golden to write statements in which Golden expressed fear for his life. (PSF ¶ 10). Although Golden did not hear any offensive comments directly from Groves, it did not deflect Groves' interference with Golden's ability to do his job as Golden felt terrified and often had headaches. (PSF ¶ 7). Of course, WSB's ignorance of Plaintiffs' complaints led to an incident where Groves sent Hernandez a picture depicting a KKK lynching. (PSF ¶ 10; Pl. Ex. A). Henley, who is a high-ranking supervisor, forwarded this picture to Golden. (*Id*).

Defendant attempts to diffuse the offensive nature of the comments indicating that tenants used these comments as well. This type of offensiveness juxtaposing is foreclosed by the Seventh Circuit. *See Kampmier v. Emeritus Corp.,* 472 F.3d 930, 940 (7th Cir. 2007) (holding a victim's own use of racial remarks does not necessarily mean that the victim welcomes these types of remarks). Displays of the confederate flag in the workplace may support a hostile work environment claim. *Ellis v. CCA of Tenn, LLC,* 650 F.3d 640, 648 (7th Cir. 2011). Whether it be the Confederate flag or another offensive flag as described by Turner, Reed, and Moore (PSF ¶ 9; Pl. Ex. EE), the fact that Groves overtly displays such offensiveness on a deadly weapon in the projects only serves to multiply its objective and subjective offensiveness.

### 2. WSB is Strictly Liable for Groves' Offensive Actions

"An employer is subject to vicarious liability to a victimized employee for an actionable

hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Ellerth,* 524 U.S. at 765 (1998); *Faragher v. City of Boca Raton,* 524 U.S. 775, 807 (1998).The employer may assert the *Ellerth/Faragher* affirmative defense unless the plaintiff reasonably resigned in response to an adverse action changing his or her employment status such as a demotion, change in position, or cut in pay. (*Id.*). Harassment that compels an employee to resign, renders the affirmative defense unavailable because such constructive discharge is a tangible employment action. *Pa. St. Police v. Suders,* 542 U.S. 129 (2004); *Patton v. Keystone RV,* 455 F.3d 812 (7th Cir. 2006).

In this case, WSB committed materially adverse actions in transferring Golden and reducing Golden and Moore to part-time. (PSF ¶¶ 27-33). As a result, WSB constructively discharged Golden and Moore. (*Id*). WSB also terminated Reed's employment. (PSF ¶ 36). As such, Defendants are strictly liable as the *Ellerth/Faragher* affirmative defense is unavailable.

**3.    Assuming, *Arguendo,* Plaintiffs did not Suffer a Tangible Employment Action, WSB has Failed to Meet Either Prong of the Affirmative Defense**

In this case, Defendants admitted Groves was Plaintiffs' supervisor for Title VII and § 1981 liability. ([D. 70, ¶ 17]; PSF ¶ 39). As such, WSB is liable for Groves' unlawful actions subject to the two-pronged affirmative defense. The two-pronged analysis requires that the employer prove (1) that it exercised reasonable care to prevent and correct any harassing conduct in the workplace; ***and*** (2) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to otherwise avoid harm. *Ellerth*, 524 U.S. at 765. WSB cannot satisfy either prong of this affirmative defense, and therefore summary judgment on

11

Plaintiffs' racial harassment allegations should be denied.[7]

### (i)    WSB Failed to Exercise Reasonable Care to Prevent and Correct any Harassing Conduct in the Workplace

The mere creation of an anti-discrimination policy will not shield a company from its responsibility to actively prevent discrimination and harassment in the workplace. *Genry v. Export Packaging Co.,* 238 F.3d 842, 850 (7th Cir. 2001). Case law also requires that the policy's complaint mechanism be reasonable. *EEOC v. V & J Foods, Inc.,* 507 F.3d 575, 578 (7th Cir. 2007).

Very recently, in *EEOC v. Mgmt. Hosp. of Racine,* the Seventh Circuit upheld a jury verdict in favor of the EEOC finding the defendant strictly liable for possessing an anti-harassment policy that did not provide a clear path for reporting harassment. 666 F.3d 422, 436 (7th Cir. 2012). In that case, the court held that because the anti-harassment policy did not contain the name or contact information of any identifiable "point person," that the Defendant did not exercise reasonable care in preventing or correcting unlawful harassment. *Id.*

In this case, it is not disputed that WSB's policy mandates "harassment must be brought to the attention of Human Resources." (Def. Ex. C). That same policy, however, does not identify who the Human Resources person(s) is and does not provide any contact information for that person(s). Despite this mandate, WSB does not even have Human Resource person(s). (P. SOF ¶ 18).[8] As mentioned above, Moore and Reed made complaints to their Field Supervisors. Golden made multiple written reports outlining Groves' behavior and conduct. (P. SOF ¶ 10). Once those

---

[7] Even if it is determined that Groves is not a supervisor, the factual arguments below will also hold that WSB was negligent in that it knew or should have known of the harassment and failed to take reasonable corrective action. *Bernier v. Morningstar, Inc.,* 495 F.3d 369 (7th Cir. 2007).

[8] Nowhere in WSB's entire handbook is there any phone number or other contact information, other than the automated recording number to track hours. (Def. Ex. C; PSF ¶ 18; Def. Ex. A, 191:18-24; 192:1-15; 192:16-22)

complaints went ignored, due to WSB's faulty anti-harassment policy, Plaintiffs did not have any alterative method of recourse to direct complaints. Like the policy in *Mgmt. Hospitality of Racine*, WSB's anti-harassment policy is wholly ineffective. It cannot, as a matter of law, be said that WSB's policy constitutes the reasonable exercising of preventive and corrective action.

WSB also failed to meet the first prong of the affirmative defense because it ignored multiple complaints from Plaintiffs, employees, and tenants. (P. SOF ¶¶ 1-3, 5-13, 21). *See Mgmt. Hospitality of Racine,* 666 F.3d at 435 (holding that the policy must not only be reasonably effective on paper, but also reasonably effective in practice). A "prompt investigation is the hallmark of reasonable corrective action." *Cerros v. Stel Tech., Inc.,* 398 F.3d 944, 954 (7th Cir. 2005).

In this case, for approximately ten months prior to Plaintiffs filing their EEOC charges, WSB obtained multiple complaints about Groves' offensive comments and simply ignored them. (PSF ¶¶ 2, 12-13, 15, 21). In fact, despite being required to escalate all complaints of harassment (PSF ¶ 25), Henley admitted to receiving as many as thirty complaints about Groves' offensive behavior and simply ignored every single one of them. (P. SOF ¶ 21). What is shocking is Defendants' own "investigation" of the lynching photo led Henley to send the picture to Golden. (PSF ¶ 9).

Finally, WSB's "investigation" was wholly insufficient and a sham crafted in an attempt to escape liability, not for purposes of preventing or correcting future harassment. Giving rise, in part, to this conclusion are flagrant contradictions and inherent fabrications in the alleged "apology letter," Groves' "discipline," whether his "pay was reduced,"[9] whether he was "suspended," when he was

---

[9] Even assuming WSB reduced Groves pay as it alleges, it essentially abrogated any such reduction by allowing him to work 20 more hours per week. In fact, it could be argued that even though Groves allegedly received a $.50 deduction in pay, by WSB scheduling him to work 20 more hours per week, WSB actually gave Groves a raise. (P. SOF ¶¶ 19, 23-24).

13

"transferred," and whether Groves was "demoted." (PSF ¶¶ 16-24). WSB simply cannot meet its burden for the first prong of the affirmative defense.

### (ii) Plaintiffs Did Not Unreasonably Fail to Take Advantages of Corrective Opportunities to Avoid Harm

Notwithstanding WSB's failure to implement an effective policy, it also cannot be said, as a matter of law, that any of the Plaintiffs unreasonably failed to take advantage of corrective opportunities afforded to them to avoid harm. At no point did anyone from WSB explain or train Plaintiffs on its anti-harassment or anti-discrimination policy and at no point did anyone from WSB ever inform Plaintiffs who they could specifically go to in order to report harassment. (P. SOF ¶ 15).

Moore complained to his Field Supervisor the very day he heard Groves call him a monkey and immediately after WSB promoted Groves. (P. SOF ¶¶ 1-2). After ignoring Moore's complaints, due to WSB's faulty policy, Moore had no other readily available recourse to direct his complaints.

Meanwhile, beginning in approximately the Summer of 2010 until early September 2010, Golden received tenant complaints and authored four written complaints outlining Groves' offensive comments. (PSF ¶¶ 10). One occasion, Golden even informed Henley. (*Id*). According to M. Kiswani, it is entirely appropriate for Golden to make such a complaint in the manner he did. (Def. Ex. A, 45:5-8; 46:4-7). The fact that WSB now denies it ever obtained these statements is an obvious genuine issue of material fact requiring a credibility determination.

Reed also made multiple verbal complaints about Groves to whoever would listen to her, including both Herrera and Henley. (PSF ¶¶ 3, 5-6, 15). Reed requested to be moved because Groves frightened her. (PSF ¶ 5). At no point, however, did anyone from WSB heed Reed's complaints. (PSF ¶ 12). Rather, Herrera patronized Reed informing her that Groves had done the same thing

14

before. (*Id*).

The circumstances that Plaintiffs worked in are vital to this case. Groves displayed an overt racial bias towards African-Americans and carried a loaded pistol. As Moore described: "[n]ot one time did I approach an individual, who had already showed me he was racially biased, about a confederate flag on his firearm that causes death." (Def. Ex. S, 158:5-14). Golden and Reed shared this sentiment. (P. SOF ¶¶ 5, 7, 14). Considering all the circumstances, it cannot be said, as a matter of law, that Plaintiffs *unreasonably* failed to take advantage of corrective actions to avoid harm.

### C.    WSB DISCRIMINATED IN PROMOTING AFRICAN-AMERICANS

In order to establish a *prima facie* case of racial discrimination for failure to promote, Plaintiffs must show that they (1) are members of a protected class; (2) they were meeting WSB's legitimate job expectations; (3) were not promoted; and (4) WSB treated similarly situated employees outside the protected class more favorably. *Montgomery v. Am. Airlines,* 626 F.3d 832, 392 (7th Cir. 2010). Statistics can be used to establish a *prima facie* case of disparate treatment. *Kadas v. MCI Systemhouse Corp.,* 255 F.3d 359 (7th Cir. 2001). WSB does not dispute the first or third element.

Plaintiffs are all African-Americans. [D.70]. As discussed below, Plaintiffs met WSB's legitimate expectations. (P. SOF ¶ 40). WSB unlawfully, at a statistically astonishing rate, promoted non-African Americans in lieu of African-Americans. (*Id*.; Pl. Ex. U). Using the promotional data provided by WSB for the years of 2009 and 2010, and conducting a disparate impact analysis shows an alarming rate of discrimination. (P. SOF ¶ 40; Pl. Ex. U). In fact, according to the chi-square report, there is less than a 1% chance that WSB's promotional selections were absent some form of bias. (*Id*.). As such, WSB's motion should be denied on Plaintiffs' discrimination claims.

15

### D.     GROVES AND I. KISWANI ARE INDIVIDUALLY LIABLE

First, Defendants' brief does not contest individual liability for the torts allegedly committed by Groves and I. Kiswani and any argument is therefore waived. Second, Defendants have also conceded Groves' liability under Section 1981 for the unlawful harassment of Plaintiffs. Third, Defendants also conceded I. Kiswani's individual liability under Section 1981 for the retaliation of Plaintiffs. *See CBOCS West, Inc., v. Humphries,* 188 S. Ct. 1951, 1961 (2008)(authorizing retaliation claims under Section 1981); *See Musikiwamba v. ESSI, Inc.,* 128 S.Ct. 1951, 1981 (2008)(finding individual liability for supervisors for intentional discrimination or harassment).

### E.     WSB RETALIATED AGAINST PLAINTIFFS FOR FILING CHARGES OF DISCRIMINATION

A reasonable jury could conclude that Plaintiffs were retaliated against for filing charges of discrimination with the EEOC. Plaintiffs can demonstrate that: (1) they engaged in statutorily protected activity; (2) they suffered adverse employment action; and (3) there is a causal connection. *Casna v. City of Loves Park*, 574 F.3d 420, 426 (7th Cir. 2009)**.** It is not is not disputed that on October 1, 2010, Plaintiffs engaged in a statutorily protected activity in filing charges. [D.70, ¶ 61].

#### 1.     Plaintiffs Suffered Adverse Employment Actions

The Supreme Court defines a materially adverse employment action for retaliation purposes to be any action that might have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe R.R. Co., v. White,* 548 U.S. 53, 67-68 (2006). An employer constructively discharging a plaintiff is considered an adverse employment action. *Pa. Suders,* 542 U.S. 129 (2004); *Patton,* 455 F.3d 812 (7th Cir. 2006);

On October 5, 2010, the EEOC notified WSB that Plaintiffs filed charges of discrimination

16

against it. (Pl. Ex. E).[10] Just ten days later, WSB reduced Golden and Moore's work schedule to part-time and scheduled Golden to be transferred to a new site requiring a longer (an hour to two hours) commute. (PSF ¶¶ 27-31). Cutting twenty percent off Moore's paycheck and at least that amount off Golden's led WSB to constructively discharge them only ten days after the EEOC sent WSB notification of their charges. (PSF ¶¶ 30, 33).

Notwithstanding the fact that WSB committed a materially adverse action in constructively discharging Golden and Moore, it also committed a materially adverse action when it reduced their respective schedule and transferred Golden. WSB does not dispute that it reduced Moore and Golden's hours. (PSF ¶¶ 28, 32). This alone constitutes a materially adverse action. *See Duncan v. Thorek Memorial Hosp.,* 784 F.Supp.2d 910, 919 (N.D. Ill. 2011)(holding a reduction in hours constitutes a materially adverse employment action). In addition, WSB transferred Golden requiring him to expend an additional hour or two in commuting to work. (PSF ¶ 27). This too is a materially adverse employment action. *See Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 811 (7th Cir. 2000). The action WSB took against Golden and Moore would dissuade a reasonable employee from complaining about discrimination. *See White,* 548 U.S. at 67-68.

Defendants' reliance on *Whittaker v. N. Ill. Univ.,* is misplaced and cited for a purpose that Court's opinion proscribed. 454 F.3d 640, 648 (7th Cir. 2005). Defendants rely on *Whittaker* for a proposition that Golden and Moore did not suffer adverse employment actions because "they quit before" they actually worked the reduced in Golden's case transferred) schedule. [D.104, Pgs. 20-24]. The *Whittaker* court, however, categorically rejected this theory holding that its analysis applied

---

[10] It is undisputed that at the time WSB committed the adverse employment actions against Plaintiffs it had already received the charges from the EEOC. (D.SOF ¶¶ 40, 48-50).

only to discrimination claims under §2000e-3(a), not retaliation claims under §2000e-2(a). *Id.*

WSB also committed a materially adverse action against Reed. As mentioned, *supra,* prior to filing her charge of discrimination, WSB placed Reed on temporary "laid-off" status with the understanding she would be re-assigned. (PSF ¶¶ 34-36). In footnote 7 of its brief, WSB concedes that as of October 1, 2010, Reed had not been terminated. [D. 104, Pg. 26]. Instead, like Golden, Moore, and Hernandez, WSB took the only remedial adverse action it could against Reed and terminated her employment on October 15, 2010. (PSF ¶¶ 34-36). Although at the time WSB terminated Reed she was temporarily "laid-off," Reed and M. Kiswani understood that Reed's employment would continue at a later date. (PSF ¶ 34). Summarily terminating an employee who had been temporarily "laid-off" would dissuade a reasonable employee from complaining about harassment or discrimination. *See White* 548 U.S. at 67-68.

### 2. There is a Causal Connection Between Plaintiffs Protected Activity and Adverse Employment Action

Under either the direct or indirect method of retaliation, to establish a causal connection between the protected activity and adverse action, a plaintiff must present "direct" or "circumstantial" evidence. *Lewis v. Sch. Dist 70,* 523 F.3d 730, 742 (7th Cir. 2008). Circumstantial evidence under the direct method is evidence that "allows a jury to infer intentional discrimination by the decision maker" and includes but is not limited to (1) suspicious timing; (2) statistical evidence of better treatment by employees outside of protected group; or (3) the employer's reason for the termination was pretext. *Sun v. Bd. of Trustees,* 473 F.3d 799, 812 (7th Cir. 2007).

Under the indirect method, a plaintiff can establish retaliation by showing that: (1) she engaged in protected activity; (2) her job performance met legitimate expectations; (3) her employer

took a materially adverse employment action against her; and (4) she was treated less favorably than similarly situated employees that did not engage in the protected activity. *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002). In this case, it is clear that under either method, there is a causal connection between Plaintiffs' protected activity and subsequent adverse actions.

Only ten days after the EEOC sent notification of Plaintiffs' charges, WSB transferred and reduced Golden's hours, reduced Moore's and Hernandez's hours, and terminated Reed. (PSF ¶¶ 27-36). Standing alone, a reasonable jury could conclude that the suspicious timing between Plaintiffs' charges and the adverse employment action is retaliatory. *See Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 315 (7th Cir. 2011) ("The district court's belief that timing *never* supports an inference of causation is untenable"); *See also McClendon v. Ind. Sugars, Inc.*, 108 F.3d 789, 796-97 (7th Cir. 1997)(noting "the causal nexus could be sufficiently demonstrated when the time period between the filing of a complaint and the adverse action was one day or one week.") (citations omitted).

The suspicious timing alone, however, is not the only indicia of WSB and I. Kiswani's intentional retaliation. At the time WSB transferred Golden, WSB did not transfer any other employees who had bee working at Hernry Horner. (PSF ¶¶ 29). In addition, at the time WSB reduced Golden and Moore's hours, WSB did not reduce any other employees hours who worked at Henry Horner or on the Henry Horner Superblock.[11] (PSF ¶ 32). None of these other employees treated more favorably than Golden and Moore filed charges of discrimination. (P. SOF ¶ 29).

In Reed's case, WSB admitted to altering documents in an effort to distort and hide the truth. (PSF ¶ 36). It is clear that by WSB's own actions, it had every intention to continue to employ Reed. (PSF ¶¶ 34-35). In fact, even days after the Kenny Bates' incident, Herrera continued to call Reed

---

[11] Except for Hernandez who also filed a charge of discrimination. (PSF ¶ 32).

to see when she would be returning to work. (Pl. Ex. 81:1-12). Upon receiving her EEOC charge, however, WSB summarily terminated Reed and altered relevant documents subject to an impeding lawsuit. (*Id*). This alone shows that WSB is lying about why it terminated Reed and raises a strong inference of retaliatory intent.

There is no evidence that Plaintiffs were not meeting WSB's legitimate expectations. In fact, I. Kiswani stated Golden was good, "an 8 or 9." (Def. Ex. A, 211:9-12). WSB does not contest that Moore was meeting legitimate expectations and I. Kiswani stated he "rates [Moore] as a six." (Def. Ex. A, 203-205).[12] In both Defendants' brief and M. Kiswani's deposition, there is no dispute that Reed did not violate any policies with respect to the suicide of her friend. (Def. Ex. B, 298:2-9). In any event, WSB's own actions indicated it still intended to employ Reed. (*Id.*). It begs the rhetorical question, if Reed truly was not meeting WSB's legitimate expectations, why would it seek to still employ her at the time she was temporarily "laid-off?"

The suspicious timing alone raises a compelling inference of retaliatory motivation. In addition, Golden and Moore have identified other similarly situated individuals treated more favorably also indicating WSB's and I. Kiswani's non-discriminatory reason is pretext. WSB also decided to play by its own rules in altering documents in an attempt to hide and conceal the truth. All of these reasons, in addition to the numerous lies and contradictions cast doubt on Defendants' story and compels this Court to deny Defendants' motion on the retaliation issues.

### F. WSB CONSTRUCTIVELY DISCHARGED GOLDEN AND MOORE

---

[12] Moore never "admitted" to fraternization with any tenants and WSB never completed any write-ups for Moore fraternizing with a tenant calling into question its truth. (Def. Ex. A, 202-204; Def. Ex. S, 236-238). In any event, the only indicia that WSB alludes to in its brief that Moore was not meeting WSB's legitimate expectations was for alleged "fraternization" which occurred as many as eight months before Moore's hours were reduced. (*Id.*).

A constructive discharge occurs when an employee is forced to resign because his working conditions, from the standpoint of the reasonable employee, have become unbearable. *Mosher v. Dollar Tree Store,* 240 F.3d 662, 667 (7th Cir. 2001). Factors to consider in determining whether an employer constructively discharged an employee is whether it is "in reasonable response to a humiliating demotion, extreme cut in pay, or transfer to a position in which she would face unbearable working conditions." *Suders,* 542 U.S. at 134.

Notwithstanding the fact that WSB transferred Golden requiring a longer commute, *see supra,* WSB also cut both Golden and Moore's hours in response to receiving their EEOC charges. (PSF ¶¶ 27-33). As mentioned above, WSB reduced Godlen and Moore's respective weekly pay by at least twenty percent. (8 hours per day/40 hours per week). (PSF ¶¶ 37-38). This reduction, from the standpoint of a reasonable employee, is unbearable. In the very least, this is a question for a jury. Ultimately transferring Golden and reducing his and Moore's hours while condoning and rewarding Groves' behavior caused a feeling of helplessness in Golden and Moore, and, as a result, WSB constructively discharged them. (PSF ¶¶ 27-33).

In its brief, Defendants argue that Golden and Moore's hours "fluctuated." Defendants fail to mention to this Court that because WSB automatically deducts 30 minutes everyday for lunch, *see* Section H, *infra,* the most hours Golden or Moore could have worked is 75 per two weeks. (PSF ¶¶ 37-38). Another explanation for this "fluctuation" is that WSB payroll is often inaccurate and employees' pay stubs do not reflect the correct number of hours they work, I. Kiswani pays the individuals in cash for hours worked but not reflected on their pay stub. (Def. Ex. A, 15-24; 17:1-4). In any event, the relevant inquiry is into how many hours WSB schedule Golden and Moore to work. Prior to filing their charges, WSB scheduled both Golden and Moore to work full-time (40 hours per

21

week). (PSF ¶¶ 27, 31). After filing their charges, WSB reduced as much as twenty percent off their scheduled hours. (PSF ¶¶ 37-38). Due to the inaccurate pay stubs and the fact that WSB cannot provide old schedules or voice recordings that track Golden and Moore's hours, a jury should be afforded the opportunity to conclude the credibility determinations required in deciding whether Plaintiffs were constructively discharged. (PSF ¶¶ 38).

### G.   PLAINTIFFS TORT CLAIMS ARE NOT PREEMPTED

Defendant relies on *Naeem v. McKesssan Drug Co.* to conclude te IHRA preempts Plaintiffs' common law torts. 444 F.3d 593, 607 (7th Cir. 2006). The *Naeem* holding derived from the pre-2008 IHRA which gave exclusive jurisdiction to the Illinois Human Rights Commission (IHRC). *Id.* at 602. The IHRA, however, was later amended to state for any charge of discrimination filed after January 1, 2008 that a "complainant has the right, within 90 days after receipt of the Department's notice, to commence a civil action in the appropriate circuit court or other appropriate court of competent jurisdiction." 775 ILCS 5/7A-102(A)(3)(3). As such, because the IHRA no longer provides exclusive jurisdiction to the IHRC, Plaintiffs' intentional torts are not preempted by the IHRA.

Defendants' brief ignores the fact that the Illinois Worker's Compensation Act "does not provide an exclusive remedy for all injuries suffered in the workplace." *Johnson v. Fed. Reserve Bank of Chicago,* 557 N.E. 2d 328, 332 (Ill.App.1990). Rather, "intentional torts, such as infliction of emotional distress apart from vexatious delay, fall outside the scope of the Act as they are not accidental and do not rise from conditions of employment." *Id.* In this case, WSB clearly had knowledge of Groves conduct and rewarded and encouraged such behavior. (PSF ¶¶ 2, 5, 10, 13, 20, 23). Given Groves supervisory status, admitted by Defendants, whether Groves is acting as the alter-

ego of WSB is a question for the jury and as such, Plaintiffs claims are not preempted by the IWCA.

Viewing all the facts as a whole, it cannot be said as a matter of law that the conduct I. Kiswani and thus WSB,[13] as well as Groves subjected Plaintiffs was truly (1) extreme and outrageous; (2) intended to cause such distress or knew of a high probability of it; (3) and the conduct in fact, caused severe emotional distress. *Lewis,* 523 F.3d at 746.

Defendants are also liable for the negligent infliction of emotional distress (NIED) onto Plaintiffs. Under Plaintiffs' theory Defendants are liable for NIED because they were placed in the zone of physical danger as a proximate cause of Defendants' negligence, they clearly had a reasonable fear of safety, and have articulated physical manifestations as a direct result. *Turner v. Williams,* 362 Ill.App.3d 541, 547 (Ill.Ap.2d 2001). In this case, an individual displaying overt racial hostility displayed a racially offensive emblem on his loaded pistol. (PSF ¶ 26). This was displayed in the low-income "project" housing of the Henry Horner Homes. (*Id*). This over display placed Plaintiffs in a zone of physical danger as a proximate result of Groves' actions and WSB and I. Kiswani's failure to act and caused Plaintiffs severe emotional distress. (PSF ¶¶ 7, 26; Def. Ex. P, 210:14-19;Def. Ex. S, 306:16-24; 307:1-7; Def. Ex. V, 177:16-24; 178:1-11;).

## H.    WSB VIOLATED THE IMWL AND FLSA

Due to its violation of Local Rule 56.1(a)(3), WSB has failed to meet its burden in dismissing Plaintiffs' wage claims. For the record, WSB files false records with the IDES in an attempt to avoid mandatory payroll taxes. (PSF ¶ 37; Pl. Ex. Z). WSB does this by improperly and unlawfully classifying employees as "1099" and failing to report income paid to those employees. A Defendant is enjoined from reporting one set of payroll records to the IDES and reporting a different set to the

---

[13] Defendants' brief does not argue vicarious liability for WSB.

District Court. The Seventh Circuit admonishes such conduct. *Matos v. Richard A. Nellis, Inc.,* 101 F.3d 1193, 1196 (7th Cir. 1996). In *Matos,* Judge Easterbrook stated that if a "[Defendant] was telling the executive branch of government [one story] to save on taxes (and actually received a tax benefit), then it is in no position to sing a different song to the judicial branch." *Id.* When an employer has failed to keep accurate records, estimates of damages are acceptable. *Anderson v. Mt. Clemons Pottery Co.,* 328 U.S. 680, 688 (1946).

In this case, WSB is unable to produce its primary method of recording Plaintiffs' hourly record keeping. (PSF ¶ 38; Pl. Ex. O). As such, using Plaintiffs are forced to use WSB's IDES' reports as a benchmark. WSB is estopped from challenging said reports. *Matos,* 101 F.3d at 1196. Based on these reports, Plaintiffs have calculated the amount of wages owed them in violation of the Illinois Minimum Wage Law (IMWL) and Fair Labor Standards Act (FLSA). Plaintiffs are also forced to estimate the money lost due to WSB subtracting 2.5 hours per week for lunches Plaintiffs did not take. (PSF ¶ 37). Those amounts are evidenced through the calculations and formulas in Plaintiffs' Exhibits V, W, and X. Plaintiffs are owed the following amounts as of the date this response was filed: (PSF ¶¶ 37, 38; Pl. Ex. T).

| NAME | Wages Due - IMWL[14] | Wages Due (Lunch) | OT Wage Due - FLSA |
|---|---|---|---|
| Latrice Reed | $14,244.81 | $432.50 | $37.50 |
| Deano Golden | $11,347.20 | $582.50 | $405.00 |
| Phylon Moore | $0.00 | $532.88 | $0.00 |

**WHEREFORE**, for the foregoing reasons, the lies, contradictions, altering documents, and factual disputes, Plaintiffs' request that this Court deny Defendants' motion in its entirety**.**

---

[14] The IMWL, 820 ILCS 105/12(a) provide for "damages of 2% of the amount of any such underpayments for each month following the date of payment during which such underpayments remain.

Respectfully Submitted,
Deano Golden, Phylon Moore, Latrice Reed

s/ Jason D Keck _____
One of Their Attorneys

Uche O. Asonye - 6209522
Scott C. Fanning - 6292790
Jason D Keck - 6303665
Asonye & Associates
39 South LaSalle Street**,** Suite 815
Chicago, Illinois 60603
(312) 795-9110
jason@aa-law.com

## CERTIFICATE OF SERVICE

I hereby certify that I have on this 15th Day of March 2012, I served a true and accurate copy of the foregoing PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, upon the following by electronically filing it with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Anthony S. Graefe
Mark Hansen
Graefe & Hansen, Ltd.
55 West Monroe Street, Suite 3550
Chicago, IL 60603

Respectfully submitted,
Deano Golden, Latrice Reed, and Phylon Moore

s/ Jason D Keck _____
One of their Lawyers

Uche O. Asonye- 6209522
Jason D Keck- 6303665
Scott C. Fanning - 6292790
Asonye & Associates
39 South LaSalle Street, Suite 815
Chicago, IL 60603
312.795.9110

25