**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **DEANO GOLDEN, PHYLON MOORE, and LATRICE REED,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **vs.** | )   **Case No. 10 C 7673** |
| | ) |
| **WORLD SECURITY AGENCY, INC., WORLD SECURITY BUREAU, INC., GLENDON GROVES, and IBRIHAM KISWANI,** | ) |
| | ) |
| | ) |
| **Defendants.** | ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW  F. KENNELLY, District Judge:

Deano Golden, Phylon Moore, and Latrice Reed have sued World Security

Agency, Inc. and World Security Bureau, Inc. (collectively WSB), as well as two WSB

employees, Ibriham Kiswani and Glendon Groves.  Plaintiffs claim that WSB, Groves,

and Kiswani subjected them to a hostile work environment, discriminated against them

based on their race (African-American), retaliated against them for complaining about

this harassment, caused them emotional distress, and failed to comply with federal and

state wage laws.  Defendants have moved for summary judgment.  For the reasons

stated below, the Court grants defendants' motion in part and denies it in part.

## Background

WSB is a licensed security company that provides guards for facilities including

Chicago Housing Authority (CHA) developments.  Kiswani is WSB's operations

manager.  In that position, he "make[s] sure that the chain of command is followed,

[that] paperwork is done correctly, [that] disciplinary actions are accounted for and made," and he oversees other "day-to-day operations." Kiswani Dep. at 19:7-12. Kiswani's brother Muhammad also works for WSB and, among other things, is "involved in investigating employee complaints of harassment or discrimination in the workplace, and providing advice to Field Supervisors in addressing personnel issues." Defs.' L.R. 56.1 Stmt. ¶ 3.

Below the operations manager in WSB's organizational hierarchy are field supervisors, who oversee daily operations at the various work sites. Some field supervisors have the authority to discipline, hire, and fire other employees. Field supervisors oversee site supervisors, who direct guard activities at a particular site. The precise scope of the responsibilities of a site supervisor is a contested issue in this case, and the Court will discuss it in more detail below.

Groves began working for WSB as a security guard in October 2009. He has worked at several CHA sites. WSB initially assigned him to Cabrini Green, later transferred him to Dearborn Homes, and then transferred him to Henry Horner Homes as a site supervisor in February or March 2010. The controversy in this case is based on plaintiffs' alleged experiences with Groves at Dearborn and Henry Horner.

Golden began working for WSB as a security guard in December 2009. After an initial assignment at a facility known at Ickes, he worked for less than two weeks at Dearborn before being transferred to Henry Horner. While at Henry Horner, he worked the same shift as Groves on two occasions and spoke with him once. Golden testified that a resident who was assigned to the "tenant patrol" told him that Groves had used the word "nigger" and that he heard from Hernandez and the other plaintiffs that

2

"Groves had used racial slurs and called some people monkeys."  Defs.' L.R. 56.1 Stmt. ¶ 77.  Golden never personally heard Groves use a racial slur.  Golden testified that submitted three written complaints regarding Groves's behavior, including one based on a tenant's report of Groves's use of a racial slur and another indicating that Golden "fear[ed] for [his] life" because Groves was armed and had indicated a racial bias. Golden Dep. at 127:5-7.

Moore started working for WSB as a security guard in February 2009.  After his initial assignment at Ickes, he worked at Dearborn for a few days and was then moved to Henry Horner.  On one occasion at Dearborn, he overheard Groves say to another guard, "Look at this monkey."  The other guard later told Moore that Groves's comment was meant to refer to Moore.  Moore testified that he reported the comment to field supervisor Serfin Herrera.  He found out just afterward that he was being transferred to Henry Horner.  Upon arriving at Henry Horner, Moore found that Groves was assigned to be his supervisor.  Moore again complained to Herrera.  Almost immediately after Moore did so, Groves received a phone call.  Groves then told Moore that "he wanted to apologize for whatever [Moore] heard."  Moore Dep. at 126:5-6.  Moore did not accept the apology but did not make any other complaints about the comment.

Moore also testified that "on occasions" he heard Groves "verbally downgrade or talk down to the African Americans in the Henry Horners," including "maybe at least once a day" making statements such as "sit your black ass down" and "[t]hey need to get their black asses in the house."  Moore Dep. at 182-183.  Moore testified that Groves "may have said things, say, 'zoo animals', or 'they're caged up, they don't want to leave the projects like animals.'"  *Id*. at 186:22-24.  Moore never heard Groves use

the word "nigger," but he heard from the same tenant patrol member as Golden that Groves had done so. Moore never submitted a written report to any supervisor or manager regarding an incident that he considered to amount to harassment. Other than the comment reported to Herrera, there is no evidence that Moore reported other incidents.

WSB hired Reed as a security guard in June 2009. After her initial assignment at Ickes, Reed was transferred to Henry Horner in the winter of 2009-10. Reed testified that in the spring of 2010, she overheard Groves telling another guard that he "work[s] with a whole bunch of niggers." Reed Dep. at 74:1-2. Reed testified that she told Herrera about this statement. Reed testified that Groves sent her a text message containing an image of stick figures including "a black hangman that was hanging from a rope and the rest of [the] hangmen was white." *Id.* at 91:9-10. Reed told Groves that she did not think the image was funny, but she did not report it to anyone.

Reed testified that she heard Groves referring to Henry Horner residents' children as "little black-ass boys" and "little niggers," and that he used those or similar words every day the two worked together. *Id.* at 144. She also testified that she heard Groves use the terms "porch monkey," "spic," and "wetback." *Id.* She said that she reported to Herrera in March 2010 that Groves was "kind of getting into it with the tenants by calling them black A's and – well, black ass and little N words, nigger words." *Id.* at 57:20-22. She testified that she made similar complaints to field supervisor John Henley in March 2010 and to Herrera in April 2010.

In the early morning hours of September 9, 2010, while WSB security guard Victor Hernandez was working the overnight shift, he showed field supervisor Henley an

4

image that Groves had sent him via text message.[1]  The image depicts "light beer" cans wearing Ku Klux Klan-style white hoods surrounding a darker-colored beer bottle hanging from a rope.  The image was accompanied by the statement, "can't keep the dark ones with light ones anymore."  Pls.' Resp. to Defs.' L.R. 56.1 Stmt. ¶ 29.  Henley reported the image to Israel Ortiz, another field supervisor, who reported it to Ibriham and Muhammad Kiswani.  At some point, Hernandez showed the image to Golden, Reed, and Moore.  Golden asked Henley to forward the picture to his cell phone.  Golden said that his head started hurting after he saw the image.  Moore said that he was present when Hernandez showed the image to Kiswani.

Later in the morning of September 9, Muhammad and Ortiz met with Groves at Henry Horner.  During the meeting, Groves confirmed that he had sent the text message but said that he had done so inadvertently.  The parties dispute what, if any, consequences Groves faced after that.  Groves testified that he was suspended for five days and wrote an "apology letter" that was distributed to all the staff.  Plaintiffs dispute the timing and distribution of the letter, and they argue that Groves's pay stubs do not reflect that a suspension occurred.  Groves was also transferred to another site after the incident, although the parties dispute when and for what reason this occurred.

Golden testified that, at some point, he saw a confederate flag on the handgrip of Groves's firearm and on the rear window of Groves's car.  Golden never reported these sightings or spoke with Groves about them.  Moore testified that he saw the flag on Groves's gun as well as on a sticker on the glove box inside Groves's car.  Moore never

---

[1]Hernandez was formerly a plaintiff in this case, but the Court dismissed his claims for want of prosecution (counts four, eight, fourteen, eighteen, and twenty-two).

reported these sightings or spoke with Groves about them.  Reed testified that she saw

the flag on the gun but did not report it to management.  Reed also said that she saw a

flag on the dashboard of Groves's car.

WSB received notices dated October 5, 2010 that plaintiffs had filed charges

with the Equal Employment Opportunity Commission (EEOC).  These charges included

claims that Groves had displayed the confederate flag in his vehicle, on his gun, and on

his cell phone.  Upon receiving the charges, Muhammad Kiswani and a field supervisor

went to the Washington Park site, where Groves was working at the time.  They took

photographs of Groves's vehicle, which at that time contained an American flag but no

confederate flag.  They also asked to see Groves's gun, but there was no confederate

flag image on it.

On or around October 15, 2010, Golden went to the WSB garage to pick up his

paycheck.  When he did so, he also received a work schedule that showed that he had

been reassigned to a different CHA site.  He believed that his commute to this site

would be "at least an hour, two hours," whereas his commute to Henry Horner had been

"20, 30 minutes."  Golden Dep. at 214:9-14.  Although he remained on the midnight-to-

8-a.m. shift, the new schedule reduced the number of shifts he worked by "a day or

two."  *Id.* at 159:5.  He testified that he asked why he was being transferred and given

reduced hours but received no response.  At that point, he "walked down the street and

just threw [the schedule] on the floor because [he] was depressed, tired of the

harassment, with the headaches and racist stuff [and] just couldn't take it no more."  *Id.*

at 158:16-19.  He never reported to work at WSB again.

At some point after the EEOC filing, Moore picked up his paycheck and received

6

a new biweekly schedule indicating that he was to work thirty-two hours per week. The schedule did not indicate whether this would be a permanent change. Moore was upset because previously he had been scheduled to work forty hours per week. He asked if he could work more hours but was told he could not. At that point, "[a]fter contemplating on it for several minutes and thinking about what [he] can and can't do with this thirty-two hours, [he] felt that there was going to be no progress in what [he] was doing." Moore Dep. at 78:2-5. He decided that he "couldn't focus on [his] job at hand with so many different things going on within the company," so he turned in his ID card and terminated his employment. *Id.*

On or around the evening of September 28, 2010, an acquaintance of Reed's named Kenny Bates came to Reed's house along with her cousin. Bates was a resident at Henry Horner, which Reed had found out about in July 2010. The cousin left, and Bates "stayed over." Reed Dep. at 107:6-9. Shortly thereafter, Bates stole Reed's weapon, keys, and car. Later, the police called Reed and told her that Bates had shot and killed himself. A few days later, Reed met with Kiswani and Ortiz. Reed testified that Kiswani told her that "with the issue that just happened, he's going to send me somewhere else." *Id.* at 112:20-21. "They told me don't worry about it, everything's okay, that, you know, I'ma [sic] put you as laid off until we find you somewhere to go and it will be like in two weeks." *Id.* at 111:4-7. Kiswani mentioned some other sites where Reed might be able to work, but she testified that she was never reassigned. Instead, she later went to pick up a paycheck and was told to turn in her identification and gun permit, which she understood to mean that her employment had been terminated. She did not work for WSB again. Defendants maintain that Reed was

offered other positions but was terminated when she chose not to accept them.

## Discussion

Summary judgment is appropriate where the record shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Lexington Ins. Co. v. Rugg & Knopp, Inc.*, 165 F.3d 1087, 1090 (7th Cir. 1999); Fed. R. Civ. P. 56(c). A court must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "The nonmoving party must offer something more than a 'scintilla' of evidence to overcome summary judgment . . . and must do more than 'simply show that there is some metaphysical doubt as to the material facts.'" *Roger Whitmore's Auto. Servs. v. Lake County*, 424 F.3d 659, 667 (7th Cir. 2005) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## A. Hostile work environment

Plaintiffs assert claims of racial harassment in counts one, two, and three respectively. The cases on which they rely indicate that they intend this as a claim that defendants created or allowed for a hostile work environment in violation of Title VII of the Civil Rights Act of 1964. Title VII "prohibits employers . . . from discriminating against their employees based on race." *Davis v. Time Warner Cable of Se. Wisc., L.P.*, 651 F.3d 664, 671 (7th Cir. 2011). Plaintiffs also assert that defendants' conduct violated 42 U.S.C. § 1981, which "prohibits racial discrimination and retaliation against employees when a contractual relationship exists between the employer and employee." *Id.* "Though the statutes differ in the types of discrimination they proscribe,

8

the methods of proof and elements of the case are essentially identical." *Id.* at 671-72.

To survive summary judgment, plaintiffs must provide evidence sufficient to show that there is a genuine issue of material fact on four elements: "(1) the work environment must have been both subjectively and objectively offensive; (2) [their] race must have been the cause of the harassment; (3) the conduct must have been severe or pervasive; and (4) there must have been a basis for employer liability." *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 390 (7th Cir. 2010). The third element of this test has also been stated as requiring a plaintiff to show that "the harassment unreasonably interfered with his work performance by creating an intimidating, hostile, or offensive working environment that seriously affected his psychological well-being . . . although the substance of the inquiry is the same either way." *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 302 (7th Cir. 2004) (internal quotation marks and citation omitted).

### 1. Offensiveness and pervasiveness

Plaintiffs' allegations regarding Groves's behavior essentially fall into three categories: the image of the beer bottles with KKK-like hoods that Groves sent to Hernandez; the confederate flag images on Groves's car and gun; and Groves's use of racial epithets and related language. The Court has no trouble concluding that a reasonable jury could find that the conduct alleged was "both subjectively and objectively offensive" as well as racially based. The proposition that the language Groves is alleged to have used meets these criteria does not appear to be in dispute. *See Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993) ("Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such

as 'nigger' by a supervisor in the presence of his subordinates.").  The image of the beer bottles depicted a rope clearly meant to represent a noose, which is, "undoubtedly, based on race" because it is "a visceral symbol of the deaths of thousands of African-Americans at the hand of lynch mobs." *Porter v. Erie Foods Intern., Inc.*, 576 F.3d 629, 635-36 (7th Cir. 2009).  In addition, "displays of confederate flags in the workplace may support a hostile work environment claim." *Ellis v. CCA of Tennessee, LLC*, 650 F.3d 640, 648 (7th Cir. 2011).

Defendants contend that, offensive though it may be, the alleged conduct was insufficiently "severe or pervasive" to meet the third element of the test.  "In evaluating the severity and pervasiveness of the conduct, [a court] examine[s] all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Smith v. Northeastern Illinois Univ.*, 388 F.3d 559, 566 (7th Cir. 2004) (internal quotation marks and citation omitted).  "We will not find a hostile work environment for mere offensive conduct that is isolated, does not interfere with the plaintiff's work performance, and is not physically threatening or humiliating." *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011).

Although comments "directed at others and not the plaintiff [] do have some relevance in demonstrating the existence of a hostile work environment, . . . the impact of "second-hand harassment" is obviously not as great as the impact of harassment directed at the plaintiff." *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1144 (7th Cir. 1997).  For example, the Seventh Circuit has contrasted a plaintiff who "was repeatedly

10

subjected to hearing the word 'nigger'" with a plaintiff who "never personally heard [a coworker] utter the word" and was only informed of the coworker's comments by others. *Smith*, 388 F.3d at 567 (internal citation omitted). The second plaintiff, who "heard an offensive term directed at a third person once and only learned from others about other offensive comments directed at third persons," had not provided evidence of "an objectively hostile work environment." *Id.*

The Seventh Circuit has also noted that offensive statements made outside a plaintiff's presence, even if accompanied by "a few [offensive] statements made directly to him," do not constitute "harassment [that is] so severe or pervasive that it alters the conditions of the plaintiff's employment." *Thompson v. Mem. Hosp. of Carbondale*, 625 F.3d 394, 401 (7th Cir. 2010). In that case, the plaintiff was told by a supervisor that he "could not do what others could do because he was black and [that] she was not sure what her neighbors would think if she invited a black person to her home." He also identified racially offensive statements that he was told about but that were made outside his presence. The Seventh Circuit ruled that this was not "severe or pervasive enough conduct to be actionable under Title VII." *Id.* "Title VII . . . will not find liability based on the 'sporadic use of abusive language.'" *Ford v. Minteq Shapes & Servs., Inc.*, 587 F.3d 845, 848 (7th Cir. 2009) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

Golden does not allege that any of Groves's conduct was directed at him personally. Instead, his claim is based on having heard from others about Groves's statements and seeing the beer-bottle image that Groves had sent to Hernandez, as

well as the confederate flags.[2]  Moore's claims are similar, except that Moore also claims that he heard Groves making other racist comments, including on one occasion referring to someone as a "monkey" (which, Groves was later told, was a reference to him).  As the Court has indicated, these statements and images are undeniably offensive, and the Court does not discount or minimize Golden's or Moore's understandable reactions to them.  Nonetheless, in light of Seventh Circuit precedent, the Court concludes that neither Golden nor Moore has presented evidence from which a reasonable jury could conclude that the conduct as they experienced it was sufficiently "severe or pervasive" to support their hostile work environment claims.  *See id.* at 847-48 (finding that plaintiff whose supervisor "once called him a gorilla" could not survive summary judgment because the comment "happened only once, did not impair [plaintiff's] job performance, and [was] insufficiently severe to rise to the level of a hostile work environment"); *Ngeunjuntr v. Metro. Life Ins. Co.*, 146 F.3d 464, 467 (7th Cir. 1998).  Golden's and Moore's hostile environment claims thus cannot survive.

By contrast, in addition to the incidents described by Golden and Moore, Reed testified that she personally heard Groves using unambiguous racial slurs, including the word "nigger."  Although the words were not directed at her, she said that she heard them on a daily basis throughout her employment.  She testified that Groves made her feel unsafe because it seemed possible that the comments would result in violence between Groves and Henry Horner residents.  Reed also testified that Groves sent her

---

[2]Although plaintiffs make much of the fact that Henley sent the image to Golden, Golden admitted that he asked Henley to do so after seeing the image.  Golden Dep. at 102:22-103:1.

an image of "a black hangman that was hanging from a rope and the rest of [the] hangmen was white." Reed Dep. at 91:9-10. "[A] noose is one of the most potent symbols of racial oppression – a symbol of terror and violence." *Porter*, 576 F.3d at 641 (Rovner, J., concurring). The Court concludes that a reasonable jury could find the conduct Reed experienced, taken as a whole, to be sufficiently severe or pervasive to satisfy the requirements for a hostile work environment claim.

### 2. WSB's liability

Defendants assert that Reed cannot make the required showing on the fourth element of the test: a basis for employer liability. To survive summary judgment, plaintiffs must show "either (1) that a supervisor participated in the harassment that created the hostile work environment or (2) that [WSB] was negligent in discovering or remedying harassment by . . . coworkers." *Montgomery*, 626 F.3d at 390. In other words, if a plaintiff demonstrates that the perpetrator of the harassment – in this case Groves – was a supervisor, this "triggers strict liability [for WSB], subject to the possibility of an affirmative defense where the plaintiff suffered no tangible employment action." *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 477 (7th Cir. 2004).

Defendants argue first that Groves was not a supervisor. Plaintiffs contend that defendants have "admitted Groves was Plaintiffs' supervisor for Title VII and § 1981 liability," Pls.' Resp. at 11, because defendants in their answer did not dispute the following allegation in the complaint: "That at all times relevant herein, Groves was employed by WSB as an Armed Security Officer and Supervisor." Defs.' Answer ¶ 17. Plaintiffs' contention is incorrect. "'Supervisor' is a legal term of art for Title VII purposes." *Rhodes v. Ill. Dept. of Transp.*, 359 F.3d 498, 506 (7th Cir. 2004). Nothing

in defendants' answer indicates that they intended to concede this legal argument.

Plaintiffs also cite to a portion of their Local Rule 56.1 Statement in which they assert that Groves was a supervisor because he "had the authority to discipline" plaintiffs and "was required to delegate assignments, sign off on all paperwork, and approve Plaintiffs' 'time-sheets.'" Pls.' L.R. 56.1 Stmt. ¶ 39. The only disciplinary power possessed by site supervisors referred to in the testimony that plaintiffs cite, however, is the ability to write "employee warning reports" for infractions such as tardiness. There is no indication that Groves had the ability to impose actual disciplinary measures based on what was documented in those reports without the approval of someone further up in WSB's hierarchy. Groves himself testified that he had "no control" over whether upper management approved an employee's request for time off; he had never sent an employee home for an infraction without receiving permission from someone else; and he did not have the authority to recommend that WSB fire an employee. Groves Dep. at 176:14-24, 201:22, 221:12-22.

"A supervisor is someone with the power to *directly* affect the terms and conditions of the plaintiff's employment[,] *i.e.* the authority to hire, fire, promote, demote, discipline or transfer." *Rhodes*, 359 F.3d at 506 (emphasis in original). "[M]erely having authority to oversee aspects of another employee's job performance does not qualify as a supervisor in the Title VII context." *Id.* The Seventh Circuit has found that an alleged harasser who "managed [a plaintiff's] work assignments, investigated complaints and disputes, and made recommendations concerning sanctions for rule violations" to the employer was nonetheless not a "supervisor" under Title VII. *Id.*; *see also Montgomery*, 626 F.3d at 390. The Court concludes that plaintiffs have not provided evidence from

which a reasonable jury could find that Groves exercised more supervisory power than the employee discussed in *Rhodes*. Thus, WSB is not strictly liable for Groves's alleged harassment.

Reed is therefore "entitled to reach a jury only if she point[s] to competent evidence that [WSB] was negligent either in discovering or remedying the harassment directed at her." *Id.* She argues that WSB was sufficiently informed of the alleged harassment through complaints made by Groves and others and that its response was inadequate. Defendants argue both that Reed did not make sufficient reports to put it on notice of Groves' behavior and that its response to the complaints it did receive were sufficient.

Reed testified that she spoke with field supervisors on several occasions regarding Groves's behavior. Defendants do not really dispute that field supervisors are "the type of employee[s] who could be expected to convey her complaints to someone who could stop the harassment." *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1038 (7th Cir. 1998). This constitutes evidence from which a reasonable jury could conclude that Reed "made a concerted effort to inform [WSB] of the racial harassment [she] was allegedly experiencing." *See Montgomery*, 626 F.3d at 391.

WSB also argues that there is no evidence of its negligence in responding to any complaints of Groves's behavior because it conducted an investigation after the beer-bottle incident and eventually transferred Groves. "Title VII requires only that the employer take steps reasonably likely to stop the harassment." *Saxton v. AT & T Co.*, 10 F.3d 526, 536 (7th Cir.1993). "An employer satisfies its legal duty in coworker harassment cases if it takes reasonable steps to discover and rectify acts of . . .

harassment of its employees." *Cerros v. Steel Techs.*, Inc., 398 F.3d 944, 952 (7th Cir.2005) (internal quotation marks and citations omitted). "In assessing the corrective action, our focus is not whether the perpetrators were punished by the employer, but whether the employer took reasonable steps to prevent future harm." *Porter*, 576 F.3d at 637. For example, an employer who "responded promptly with remedial action reasonably calculated to end [coworker's] harassment of [plaintiff] by making clear to [coworker] that further harassment would result in termination and credibly promising [plaintiff] that he would have no contact with [coworker] at work" was entitled to summary judgment on a hostile-environment claim. *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1049 (7th Cir. 2000).

Reed contends that WSB took no action after she made several complaints about Groves's behavior. "[A]lthough Title VII does not require that the employer's responses to a plaintiff's complaints successfully prevent subsequent harassment," the employer must do something. *Cerros*, 398 F.3d at 954. Although WSB responded to the text messaging incident, Reed testified that Groves was using racially offensive language well before that occurred and that WSB failed to respond to her complaints about it. The Court concludes that a reasonable jury could find from this evidence that WSB was negligent in responding to Reed's complaints.

For these reasons, the Court grants defendants' motion for summary judgment on counts one and two of plaintiffs' complaint but denies it with respect to count three.

**B.    Discrimination claims**

In counts five, six, and seven, plaintiffs assert claims of race discrimination against all defendants. Although plaintiffs do not specify as much in their brief, the case

16

on which they rely indicates that they intend to proceed under the indirect method of providing discrimination.  Thus, to survive summary judgment, they must introduce evidence from which a reasonable fact finder could determine that:  (1) they were members of a protected class, (2) they were performing their jobs satisfactorily, (3) they suffered an adverse employment action, and (4) WSB treated similarly situated individuals outside their protected class more favorably.  *Montgomery*, 626 F.3d at 394.

Plaintiffs' only contention regarding having suffered an adverse employment action is that they were not promoted.  The only evidence or argument they offer regarding similarly situated individuals being treated more favorably is a "chi-square" statistical analysis based on plaintiffs' counsel having entered into an Internet-based application "promotional data provided by WSB for the years of 2009 and 2010."  Pls.' Resp. at 15.  Plaintiffs argue that the printout of the results from the application demonstrates that "WSB unlawfully, at a statistically astonishing rate, promoted non-African-Americans in lieu of African-Americans."  *Id.*

Defendants argue, among other things, that this evidence is not admissible without expert testimony.  The question of whether a particular statistical study is admissible is "for the judge to say, on the basis of the evidence of a trained statistician." *Kadas v. MCI Systemhouse Corp.*, 255 F.3d 359, 363 (7th Cir. 2001).  "[I]f the plaintiff offers a statistical comparison without expert testimony as to methodology or relevance to plaintiff's claim, a judge may be justified in excluding the evidence."  *Carter v. Ball*, 33 F.3d 450, 457 (4th Cir. 1994).  Several courts have noted that this is not a *per se* rule. For example, in a case where a defendant "sought to counter allegations of widespread discrimination by demonstrating the higher percentage of African-Americans holding the

positions for which [plaintiff] applied than contained in the applicant pool," the Fourth Circuit found (in an unpublished decision) that "expert testimony is unnecessary to complete the simple division to find the relevant percentages or to interpret the results in this posture to negate the inference of discrimination." *Majeed v. Columbus County Bd. of Educ.*, No. 99-1341, 2000 WL 524804, at *5 (4th Cir. May 2, 2000); *see also Zuniga v. Boeing Co.*, 133 Fed. Appx. 570, 581 (10th Cir. 2005) ("Juries are able to make basic inferences from simple statistical information, [such as] evidence showing that 75% of those employees who were actually terminated [were over a certain age]."); *Anderson v. Cornejo*, 284 F. Supp. 2d 1008, 1039 (N.D. Ill. 2003) (finding that expert testimony was not required when declarant made "no attempt to analyze the data" and "did [not] perform anything more complicated than simple arithmetic[: h]e added up the totals in various combinations of categories and provided the percentages").

In this case, however, the analysis offered by plaintiffs' goes far beyond a simple percentage comparison or elementary mathematics. Rather, plaintiffs offer a purported chi-square analysis, based on an Internet application whose accuracy they have not attempted to establish, that they assert demonstrates to a near certainty that WSB's hiring pattern could only have been the result of racial bias. This goes far beyond the sort of "simple arithmetic" that courts have allowed without expert testimony. *See King v. Gen. Elec. Co.*, 960 F.2d 617, 627 and n.5 (7th Cir. 1992) (noting that a chi-square analysis is "not without its difficulties . . . and a court presented with such statistical evidence should be careful to evaluate the process by which the results were obtained"); *Barnett v. Tech. Intern., Inc.*, 1 F. Supp. 2d 572, 580 n.10 (E.D. Va. 1998) ("Although [plaintiff] assures the Court that the chances of the statistical disparity in this

18

case occurring by chance is virtually zero, . . . layman assurances are not enough."). The Court concludes that plaintiffs' analysis is not admissible without expert testimony explaining it and tending to show its accuracy, which plaintiffs have not attempted to offer.

Even were the printout admissible, however, it would not support plaintiffs' claim. Plaintiffs emphasize the statement in the printout that "there is less than a 1% chance that WSB's promotional selections were absent some form of bias." Pl. Ex. U at 2. They fail to note, however, that the printout also contains the following statements:

> Non-Minorities Applicants are Selected at a rate less than 80% (4/5ths) of the rate that Minorities Applicants are Selected.

*Id.*

> These results show that the proportion of Minorities Selected is more than two standard deviations above the proportion of Applicants (Minorities plus Non-Minorities" Selected.

*Id.* at 3.

> These results show the proportion of Applicants Selected who were Minorities (r/n=0.4545) is not contained in the confidence interval. Therefore a finding of disparate impact is supported by this data. However, since the proportion of Applicants Selected who were Minorities is above the Upper Bound of the Confidence Interval, *the observed finding of disparate impact is against Non-Minorities Applicants.*

*Id.* at 3-4 (emphasis added). Plaintiffs provide no explanation as to how the analysis, despite these statements, could support a finding of disparate impact against African-American applicants for promotion. They provide no other evidence in support of their promotion-related discrimination claims.

For these reasons, the Court grants defendants' motion for summary judgment on counts five, six, and seven.

**C.     Constructive discharge claims**

In counts nine and ten, Golden and Moore claim that WSB constructively discharged them.  "In order to show that a hostile work environment resulted in a constructive discharge, [a plaintiff] must not only demonstrate that a hostile work environment existed but also that the abusive working environment was so intolerable that [his] resignation was an appropriate response."  *Herron*, 388 F.3d at 303 (internal quotation marks and citation omitted).  "The working conditions for constructive discharge must be even more egregious than the high standard for hostile work environment because an employee is expected to remain employed while seeking redress."  *Id.* at 303 (internal quotation marks and citation omitted).

"Because [Golden and Moore have] failed to show work conditions so egregious as to meet the stringent hostile work environment standard, [they] certainly cannot reach the even higher threshold required to show a constructive discharge."  *Whittaker v. N. Illinois Univ.*, 424 F.3d 640, 647 (7th Cir. 2005).  This is so even though plaintiffs appear to base their constructive discharge claims primarily on their reduced hours rather than on discriminatory conduct.  They have presented no evidence from which a reasonable jury could conclude that their "working conditions were so intolerable that [they] had to quit."  *See Roby v. CWI, Inc.*, 579 F.3d 779, 785 (7th Cir. 2009) (contrasting the plaintiff with employees whose co-workers had threatened or engaged in actual violence).  The Court therefore grants defendants' motion for summary judgment on counts nine and ten.

**D.     Retaliation claims**

In counts eleven, twelve, and thirteen, plaintiffs assert that WSB retaliated

against them after they submitted a complaint to the EEOC.  Title VII forbids retaliation against anyone who "has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).

An employee may establish retaliation by proceeding under either the direct or indirect method of proof.  *Roney v. Illinois Dep't of Transp.*, 474 F.3d 455, 459 (7th Cir. 2007).  Under the direct method, a plaintiff must show that he engaged in a statutorily protected activity; he suffered an adverse action taken by the employer; and there was a causal connection between the two.  *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006).  "Under the indirect method, the plaintiff must show that (1) she engaged in a statutorily protected activity; (2) she performed her job according to her employer's legitimate expectations; (3) despite her satisfactory job performance, she suffered an adverse action from the employer; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity." *Rhodes*, 359 F.3d at 508.

Defendants argue first that Golden and Moore cannot prevail under either method because they did not suffer an adverse employment action.  Golden's and Moore's claims are based on the new schedules they received immediately before resigning their employment.  Both schedules reflected reduced hours for the upcoming work period, and Golden's reflected a transfer to a new site with a lengthier commute. Both, however, left their jobs before these changes took effect.

Defendants contend that this claim is foreclosed by *Whittaker*, in which the

21

Seventh Circuit considered whether a scheduled three-day suspension without pay could qualify as an adverse employment action even though the plaintiff quit before serving the suspension. The court noted that such actions are "[t]ypically . . . economic injuries" and that an employee who "never served the suspension . . . never realized any economic effect from the slated employment action." *Whittaker*, 424 F.3d at 647. "Simply put, a suspension without pay that is never served does not constitute an adverse employment action." *Id.* Plaintiffs contend that the Seventh Circuit "categorically rejected this theory holding that its analysis applied only to discrimination claims under [§ 2000e-2(a)], not retaliation claims under [§ 2000e-3(a)]." Pls.' Resp. at 17. They are incorrect. Nothing in the case indicates that the holding is limited in this manner. Indeed, the court stated that it was addressing both the discrimination claim and the retaliation claim "in tandem" and used the above rationale "to dispose of both claims." *Whittaker*, 424 F.3d at 647.

"To be sure, a reduction in hours could be an adverse action giving rise to liability." *Hill v. Potter*, 625 F.3d 998, 1001 (7th Cir. 2010); *see also Duncan v. Thorek Mem'l Hosp.* 784 F. Supp. 2d 910, 919 (N.D. Ill. 2011) (finding that reduction in hours resulting in lost wages and benefits constitutes adverse employment action). Nonetheless, the Court concludes that *Whittaker* forecloses Golden's and Moore's claims. The reasoning in that case depended on the plaintiff having left her job before serving the suspension, because "'an action which, it turns out, had no effect on an employee is not an adverse action.'" *Whittaker*, 424 F.3d at 647 (quoting *Stavropoulos v. Firestone*, 361 F.3d 610, 617 (11th Cir. 2004)). Just as in *Whittaker*, the reduction in Golden and Moore's hours had no effect on them because they quit their employment

before working the new schedule.

In *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006), the Supreme Court clarified that "the standard for when a reassignment of duties is a materially adverse action . . . means 'it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Lucero v. Nettle Creek Sch. Corp.*, 566 F.3d 720, 728-29 (7th Cir. 2009) (quoting *Burlington Northern*, 548 U.S. at 68). Although *Whittaker* preceded *Burlington Northern*, the Seventh Circuit applied the same standard as the Supreme Court. *Whittaker*, 424 F.3d at 648. This further supports the application of *Whittaker* to this case. It is clear that "a suspension without pay . . . would constitute an adverse employment action." *Id.* at 647. In *Whittaker*, as in this case, the plaintiff was aware that the challenged action would have an effect on a subsequent paycheck – an outcome that might dissuade a reasonable worker from complaining to his employer. In both cases, however, the plaintiff quit before receiving the lower paycheck, and the last paycheck the plaintiff actually received was not affected by the potentially adverse action. If this situation could not constitute a "realized" economic injury in *Whittaker*, the Court does not see how it can do so in this case. *See id.* The Court therefore grants summary judgment in favor of defendants on counts eleven and thirteen.

The Court turns next to Reed's retaliation claim. Although Kiswani suggested in his deposition that Reed quit rather than being laid off, defendants do not contest in their briefs that Reed was discharged or that this qualified as an adverse employment action. Rather, they contend that Reed cannot succeed under either the direct or the indirect method of proof because she has provided insufficient evidence of a

relationship between her protected action (her filing of an EEOC complaint) and her termination. Reed maintains that she has provided direct evidence of retaliation because both the timing and circumstances of her termination were suspicious.

Reed testified that the Bates incident occurred on or around Friday, September 24, 2010, and that she met with Kiswani and the other WSB personnel the following Monday. She maintains that Kiswani told her at that meeting that he was placing her on "temporarily laid-off" status and would reassign her within two weeks. She also claims that she was not asked at the meeting to turn in her identification or her firearms license. She argues that this indicates WSB's intent to continue to employ her because non-employees are not allowed under state law to keep the firearms license. On October 15, 2010, however, WSB received notice of Reed's EEOC complaint. At some point thereafter (the precise day is not clear from the record), Reed came in to pick up a paycheck and was asked to turn in her license, which indicated that she had been terminated. She was not assigned any jobs after the Bates incident.

Defendants argue that Reed was terminated after she refused to accept positions that were offered to her. Kiswani testified that he asked Reed for her license immediately after they met regarding the Bates incident but that the license was in the possession of the police. After the police returned it to her, Kiswani renewed his request when Reed came to pick up her paycheck. Although a reasonable jury could believe defendant's version, the Court concludes that the facts as Reed describes them could support an inference of retaliation.

Defendants maintain that mere suspicious timing does not, in this case, justify an inference of retaliation. Timing can, in certain cases, be enough to allow for such an

inference.  *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (noting that timing may be sufficient when the protected and adverse actions are "very close"); *Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009) (finding that employee who was fired the day after making a complaint had the "extreme case . . . where the adverse impact comes 'on the heels' of the protected activity"); *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 511 (7th Cir. 1998) ("fairly soon"); *McClendon v. Indiana Sugars, Inc.*, 108 F.3d 789, 796-97 (7th Cir. 1997) (two days); *Simpsons v. Montgomery Ward & Co., Inc.*, No. 96-2386, 1997 WL 411230, at *4 (7th Cir. July 14, 1997) (ten days); *Holland v. Jefferson Nat. Life Ins. Co.*, 883 F.2d 1307, 1315 (7th Cir. 1989) (one week).

Reed has alleged that she was asked to turn in her identification and license "on or around" the day that WSB received her EEOC complaint.  Reed Dep. at 139.  This constitutes evidence from which a reasonable jury could find that the interval was short enough to justify an inference of retaliation.  Defendants argue that this inference is defeated by documents demonstrating that Reed was looking for employment elsewhere and by the fact that Golden and Moore, who also submitted EEOC complaints, were not terminated.  They provide no legal support for these arguments, however, and the Court does not find them convincing.

For these reasons, the Court denies defendants' motion for summary judgment on count twelve.

**E.      Emotional distress claims**

In counts fifteen, sixteen, and seventeen, plaintiffs assert claims for intentional infliction of emotional distress (IIED).  In counts nineteen, twenty, and twenty-one, they

25

assert claims for negligent infliction of emotional distress (NIED).

Defendants argue that both sets of claims are preempted by the Illinois Human Rights Act (IHRA). "The IHRA gives the Illinois Human Rights Commission exclusive jurisdiction over civil rights violations." *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 602 (7th Cir. 2006) (citing 775 ILCS 5/8-111(C) ("Except as otherwise provided by law, no court of this state shall have jurisdiction over the subject over the subject of an alleged civil rights violation other than as set forth in this Act.")). "[T]he IHRA does not preclude courts from exercising jurisdiction over all tort claims factually related to incidents of [discrimination]." *Id.* "Rather, whether the circuit court may exercise jurisdiction depends upon whether the tort claim is inextricably linked to a civil rights violation such that there is no independent basis for the action apart from the [IHRA] itself." *Maksimovic v. Tsogalis*, 177 Ill. 2d 511, 517, 687 N.E.2d 21, 23 (1997).

"The distinction between claims that are preempted and claims that are not preempted turns on the legal duty that the defendant allegedly breached." *Naeem*, 444 F.3d at 604. "[T]hat is, if the conduct would be actionable even aside from its character as a civil rights violation because the IHRA did not furnish the legal duty that the defendant was alleged to have breached, the IHRA does not preempt a state law claim seeking recovery for it." *Id.* (internal quotation marks and citations omitted). For example, a claim may be preempted if "[a]bsent the [IHRA's] prohibition[s] . . . the employer's hiring and retention of an employee whose conduct created a hostile work environment would not have been an actionable tort." *Maksimovic*, 177 Ill. 2d at 516-17, 687 N.E.2d at 23. By contrast, "[w]here the complaint alleges a tort recognized at common law, such that the elements of the tort can be established without reference to

26

the legal duties created by the [IHRA], the state law claim is not preempted." *Mendez v. Perla Dental*, 646 F.3d 420, 422 (7th Cir. 2011). In *Mendez*, the plaintiff claimed that the defendant retaliated against her after she complained of sexual harassment. The claim was not preempted because "the complaint also alleged that she was fired for filing a police report concerning the assault," which would constitute an "Illinois common law tort without reference to the duties created by the [IHRA]." *Id.*

Plaintiffs' IIED claims in this case are based on their contentions that "Groves subjected [them] to intentional racial discrimination and harassment during [their] employment," that resulted in "intimidation, apprehension, fear, [and] offensive and demeaning conduct which was likely to create an emotionally charged or periled environment," and that "as a direct result of Defendants' intentional discriminatory conduct, [plaintiffs have] suffered and continue[ ] to suffer severe emotional distress, fright, physical illness, mental anguish, humiliation, and embarrassment." Am. Compl. ¶¶ 260-61; 270. These allegations and the arguments in plaintiffs' brief indicate that the only basis for the IIED claims is the conduct that also provides the basis for the hostile environment claims.

If a "claim of intentional infliction of emotional distress is supported by factual allegations identical to those set forth in [plaintiff's] Title VII . . . claim," the claim is preempted by the IHRA. *Quantock v. Shared Mkting. Servs., Inc.*, 312 F.3d 899, 905 (7th Cir. 2002); *see also Bannon v. Univ of Chicago*, 503 F.3d 623, 630 (7th Cir. 2007) (finding IIED claim preempted when plaintiff's "primary allegation is that [defendant] caused her emotional distress by his use of racial slurs" and thus it was defendant's "alleged breach of his duty under the IHRA to refrain from discrimination that [plaintiff]

27

claims caused her distress"); *Smith v. Chicago Sch. Reform Bd. of Trs*, 165 F.3d 1142, 1151 (7th Cir. 1999) (finding IIED claims preempted when plaintiff "had pitched her entire case on the theory that she is a victim of *racial* harassment and retaliation" and thus the "state-law theories sound primarily in racial discrimination") (emphasis in original).

Plaintiffs appear to assert that this is no longer the law in Illinois because amendments to the IHRA allow a complainant to commence an action in civil court under certain circumstances. As defendants point out, however, the statute only permits an action in civil court after a plaintiff has taken several procedural steps involving the Illinois Department of Human Rights. In a case where a plaintiff files a charge with the EEOC, as plaintiffs in this case have done, the IHRA permits the filing of a civil action if the EEOC has found "reasonable cause to believe that there has been a violation of federal law and . . . the Department has adopted [this] determination." 775 ILCS 5/7A-102(A-1)(2). Plaintiffs do not suggest that they have taken any of the required steps, nor do they provide any support for their contention that this possibility invalidates the preemption doctrine as a whole. The Court concludes that plaintiffs' IIED claims are preempted by the IHRA.

Although plaintiffs' complaint indicates that they seek to recover against Groves on this claim based on his role as a supervisor, the Court has found that Groves was not a supervisor for purposes of Title VII. Because the IHRA only governs employers' behavior, plaintiffs' claims against Groves as an individual may therefore not be preempted. The Court need not resolve this question, however, because it concludes that plaintiffs' claim could not survive even if it were not preempted by the IHRA.

28

To state a claim for IIED under Illinois law, a plaintiff must allege that: "(1) the defendant's conduct was extreme and outrageous; (2) the defendant either intended to inflict severe emotional distress or knew that there was a high probability that [his] conduct would do so; and (3) the defendant's conduct actually caused severe emotional distress." *Graham v. Commonwealth Edison Co.*, 318 Ill. App. 3d 736, 745, 742 N.E.2d 858, 866 (2000). The standard is high, and "under no circumstances [do] mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities qualify as outrageous conduct." *Feltmeier v. Feltmeier*, 207 Ill. 2d 263, 270, 798 N.E.2d 75, 80 (2003) (internal quotation marks and citation omitted). "Rather, the nature of the defendant's conduct must be so extreme as to go beyond all possible bounds of decency and to be regarded as intolerable in a civilized community." *Id.*, 798 N.E.2d at 80-81.

The Seventh Circuit has noted that because of this "high threshold" for outrageous conduct, "this Court and other federal courts applying Illinois law have denied recovery to plaintiffs who alleged that their employers subjected them to a continuous series of intentionally discriminatory acts." *Van Stan v. Fancy Colours & Co.*, 125 F.3d 563, 568 (7th Cir. 1997) (citing *Harriston v. Chicago Tribune Co.*, 992 F.2d 697, 703 (7th Cir. 1993) (disallowing IIED claim by plaintiff whose allegations included that she was not allowed to supervise white subordinates, excluded from office activities, subjected to wiretapping, and had her vehicle vandalized); *Briggs v. North Shore Sanitary Dist.*, 914 F. Supp. 245, 252 (N.D. Ill. 1996) (finding insufficient allegations that the plaintiff's employer and fellow employees hung a pickaninny doll in her office, subjected her to racial slurs, excluded her from office social activities, placed

29

her on probation and refused to train her properly)); *see also Chi v. Loyola Univ. Med. Ctr.*, 787 F. Supp. 2d 797, 808 (N.D. Ill. 2011) (holding that "unsettling" allegations of an "unfair and perhaps even abusive work environment" that included co-workers using racial slurs in plaintiff's presence could not support IIED claim); *Fernando v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 882 F. Supp. 119, 123-24 (N.D. Ill. 1995) (finding that "extreme verbal abuse" that included racial slurs and was "inappropriate and offensive" did not constitute extreme and outrageous conduct).

As the Court has recognized, the conduct alleged was inappropriate and offensive. Plaintiffs provide no argument, however, in support of their contention that it could qualify as extreme and outrageous conduct under the standards discussed above. The Court concludes that Groves's behavior cannot support a claim for IIED.

Plaintiffs' NIED claims are similar, but they also include the allegation that "due to Groves' animosity, hatred, and intentional discrimination and harassment, and the fact that Groves carried a semi-automatic pistol containing a Confederate flag, [plaintiffs] feared for [their] own safety." Am. Compl. ¶¶ 322, 330, 338. Plaintiffs argue that they have demonstrated emotional distress under the "'zone of physical danger' test." *Turner v. Williams*, 326 Ill. App. 3d 541, 547, 762 N.E.2d 70, 76 (2001). Under this formulation, to recover for NIED, "a bystander must be in the zone of physical danger to the direct victim created by a defendant's negligent conduct, have a reasonable fear for his own safety based on a high risk to him of physical impact, and show physical injury or illness as a result of the emotional distress caused by the defendant's negligence." *Id.* Plaintiffs provide no argument for why they qualify as "bystanders" or how Groves's possession of a gun, even one emblazoned with a racially offensive symbol, created a

30

"high risk . . . of physical impact."

For these reasons, the Court dismisses counts fifteen, sixteen, seventeen, nineteen, twenty, and twenty-one.

**E.    Wage claims**

Plaintiffs argue that WSB failed to pay them the amount required by the Illinois Minimum Wage Law (IMWL), 820 ILCS 105/4(a)(1), which through July 1, 2010 required "wages of not less than $8.00 per hour,"[3] and the Fair Labor Standards Act (FLSA), 29 U.S.C. § 206(a)(1)(C), which requires employers to pay at least $7.25 per hour.  Both statutes also authorize courts to award damages for underpayment.

Plaintiffs' arguments are somewhat difficult to follow; they have done next to nothing to develop their wage claims.  Reed and Golden contend first that they were not paid anything for several months of their employment.[4]  In advancing their claim, however, they do not actually deny that they were paid for the disputed hours.  They do not maintain in their brief or their Local Rule 56.1 statement that they received no money for their work.  Instead, they claim that defendants are legally barred from placing any evidence of those payments before the Court.

Plaintiffs maintain that WSB failed to list several payments to Reed and Golden in certain reports that it submitted to the Illinois Department of Employment Security (IDES).  These reports comprise a quarterly record of wages paid to a company's workforce.  Some of the IDES reports that WSB submitted during Reed and Golden's

---

[3] The Illinois Minimum Wage Act requirement was raised from $8.00 per hour to $8.25 per hour on July 1, 2010.  820 ILCS 105/4(a)(1).

[4] Reed and Groves appear to make this argument only with regard to their IMWL claim.

employment reflect that Reed and Golden received wages for a particular quarter, and some do not.  Plaintiffs state that because WSB has failed to provide them with records of the hours they worked, they are "forced" to calculate those hours (and thus the amount they are owed) based on the IDES reports.  Pls.' Resp. at 24.  Plaintiffs also contend that because the failure to include Reed's and Golden's hours on the IDES reports was improper, defendants are "estopped from challenging said reports."  *Id.* Accordingly, plaintiffs' counsel have used the reports to generate a spreadsheet suggesting that Reed and Golden were paid nothing during the quarters for which they are not included in the reports.

The parties appear to agree that Reed and Golden's wages were not reflected in the reports for certain quarters because Reed and Golden were classified as "1099 employees" during those periods.  The Court notes that the term "1099 employees" is a bit of a misnomer, because a form 1099 is appropriately used by a business to report amounts paid to non-employees, who are responsible for paying their own taxes.  By contrast, if a worker is an employee, the employer has the legal responsibility to withhold taxes and report the employee's wages and withholding to the IRS using a form W-2.  The Court will use the phrase "1099 workers" in discussing this issue.

Plaintiffs maintain that WSB classifies employees as 1099 workers and "files false records with the IDES in an attempt to avoid mandatory payroll taxes."  Pls.' Resp. at 23.  None of the evidence they cite reflects WSB's motivation, however, nor do plaintiffs provide any legal argument in support of their contention that WSB's motives in this regard are relevant to the Court's consideration of this aspect of plaintiffs' wage claims.

32

Plaintiffs nonetheless maintain that defendants are barred under *Matos v. Richard A. Nellis, Inc.*, 101 F.3d 1193 (7th Cir. 1996), from introducing any evidence that appears to contradict the IDES reports.  In that case, the Seventh Circuit considered whether a defendant whose corporate records reflected various loans had demonstrated that the loans had been repaid.  The court noted that it was "far from clear that [defendant Nellis] would be allowed to deny [the loans'] existence – for if Nellis was telling the executive branch of government that loans existed in order to save on taxes (and actually achieved a tax benefit), he is no position to sing a different song to the judicial branch."  *Id.* at 1196.

As support for this statement, the court in *Matos* cited *Astor Chauffeured Limousine Co. v. Runnfeldt Investment Corp.*, 910 F.2d 1540, 1547-49 (7th Cir. 1990).  That portion of *Astor* deals with the doctrine of judicial estoppel.  Judicial estoppel "prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding."  *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (citation omitted).  The doctrine prevents a litigant from successfully making a representation to one tribunal and then reversing itself in front of another tribunal.  *See, e.g.*, *In re Airadigm Commc'ns, Inc.*, 616 F.3d 642, 662 (7th Cir. 2010); *Pakovich v. Broadspire Servs., Inc.*, 535 F.3d 601, 606 (7th Cir. 2008).  The application of judicial estoppel is limited to cases such as those in which "a party to an administrative proceeding obtains a favorable order that he seeks to repudiate in a subsequent judicial proceeding."  *Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1427 (7th Cir. 1993).  Even if WSB's representations to the IDES were false in the manner that plaintiffs claim, WSB was not a litigant before a tribunal or a party to any

33

other sort of proceeding when it made the claims in the reports. The Court concludes that the IDES reports do not bar defendants from presenting evidence of payments made to Reed and Golden.

Defendants have provided copies of checks issued to Reed and Golden during the disputed periods, which further undermine plaintiffs' contention that they were never paid. The hourly totals on these checks correspond generally with the hourly totals in plaintiffs' counsel's spreadsheet, and there is no other indication regarding where plaintiffs' counsel could have obtained these figures. In sum, the Court concludes that no reasonable jury could find that Reed and Golden are entitled to compensation under the IMWL for the hours they have calculated based on the IDES reports.

Reed and Golden also contend that they are owed overtime pay. FLSA requires employees who work more than forty hours in one workweek to be paid "at a rate not less than one and one-half times the regular rate at which he is employed" for the additional hours. 29 U.S.C. § 207(a). A plaintiff "has the burden of proving that he performed overtime work for which he was not properly compensated, and if he contends that his employer's records are not accurate . . . then he must 'produce sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.'" *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 691 (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946)). In *Turner*, the plaintiff believed he had "been denied a 'substantial amount' of money" and "suggest[ed] he ha[d] information confirming the amount of overtime he was denied, but this 'information' ha[d] never been placed in the record." *Id.* at 690. The defendant submitted payment records, and although the plaintiff "dispute[d] the accuracy of [the]

34

records, his mere assertions are insufficient to create a jury issue." *Id.* at 691.

Plaintiffs' brief and Local Rule 56.1 statement contain no argument or evidence regarding overtime hours that Reed and Golden worked. Plaintiffs' counsel's spreadsheet contains numbers for overtime wages supposedly due, but plaintiffs have provided no foundational testimony or other evidence that indicates how these numbers were calculated or where they come from. Kiswani testified that he sometimes allows guards who so request to work more than forty hours without receiving overtime pay, but he did not say anything about whether Reed or Golden had done so. Moreover, as defendants point out, Golden only testified regarding one occasion on which he worked overtime. He stated that although he "had to wait for the following period" to be compensated for the extra hours, his next check reflected the overtime pay and he "never again" worked overtime for WSB. Golden Dep. at 165-66. Reed testified that she never worked overtime at Henry Horner but that she had done so at Ickes without being properly compensated. When asked how many overtime hours she worked, however, she provided no information regarding days, times, or number of hours worked. Reed Dep. at 162-64. This is not "sufficient evidence to show the amount and extent of [Reed's supposedly uncompensated] work as a matter of just and reasonable inference." *See Turner*, 595 F.3d at 691. Indeed, on the present record, the spreadsheets are inadmissible due to the absence of foundational evidence. The Court concludes that plaintiffs have not provided evidence from which a reasonable jury could conclude that Reed and Golden are entitled to overtime pay.

Finally, all three plaintiffs contend that WSB owes them money because they worked during their lunch breaks and that "WSB automatically deducts 30 minutes per

day . . . [regardless] if the worker takes a lunch or not." Pls.' L.R. 56.1 Stmt. ¶ 37.

Defendants do not dispute that this is WSB policy or that plaintiffs who worked, for example, an eight-hour day were paid for seven and one-half hours. They argue that they are not legally required to compensate employees for meal breaks and that plaintiffs have not provided sufficient evidence to demonstrate that they were not paid.

Plaintiffs do not contend that WSB's 30-minute deduction was legally improper for the days on which they actually took a lunch break. Instead, they argue that WSB deducted the time even when they worked through the break and that, as a result, they were not paid the amount required by the minimum wage laws for work they actually performed. As with their other calculations, plaintiffs contend that they are "forced to estimate the money lost" based on the alleged lunch policy. Their cited evidence for these estimates is the following.

Golden submitted a self-completed time sheet for a two-week period in September-October 2010. The sheet contains rows labeled with dates and columns labeled "Regular Hours," "Lunch," "Overtimes [sic] Hours," and "Total Hours." Each date box under "Regular Hours" is filed in with the number 8, and each box under "Lunch" is pre-printed with "-0.5". Pl. Ex. N. Golden wrote "No Break" in five of the boxes under "Overtimes [sic] Hours." *Id.* Eight of the boxes for "Total Hours," including those in the rows labeled with "No Break," are filled in with "7.5". *Id.* Golden also completed an affidavit containing the following statement: "That it is my best estimate that I worked approximately 58.5 hours that were automatically deducted from my paycheck for lunch that I did not take." Pl. Ex. T. This number appears to be drawn from the spreadsheet created by plaintiffs' counsel, which indicates that Golden worked

two and one-half unpaid hours during nearly every week between April and October 2010. Pl. Ex. W. None of this evidence indicates the basis for these calculations.

Moore testified that the officers at a particular site decided among themselves when to take lunch breaks but that if there was only one officer assigned to a building, that officer could not leave for lunch. Moore testified that this occurred on "[s]everal occasions" but that it changed at some point in the summer of 2010. Moore Dep. at 85:11-86:7. Moore also completed an affidavit containing the following statement: "That it is my best estimate that I worked approximately 52.50 hours that were automatically deducted from my paycheck for lunch that I did not take." Pl. Ex. T. As with Moore, this figure is also reflected in a spreadsheet that, like the affidavit, does not indicate the source of the information. Pl. Ex. X.

Reed testified that when she was working with another guard, they would frequently not take a lunch break and instead eat at the front desk. Reed Dep. at 42. Reed also testified that while she worked at Henry Horner, it would "generally be required that the other guard that is manning the site along with [Reed] stay on duty" while Reed took a lunch break and vice versa. *Id.* at 50:6-8. Reed also completed an affidavit containing the following statement: "That it is my best estimate that I worked approximately 43.25 hours that were automatically deducted from my paycheck for lunch that I did not take." Pl. Ex. T. Reed's spreadsheet also reflects this number but neither it nor the affidavit indicate how Reed or her counsel made the estimate.

The Court concludes that plaintiffs have not provided evidence from which a reasonable jury could find "the amount and extent of [their lunchtime hours] as a matter of just and reasonable inference." *See Turner*, 595 F.3d at 691. Beyond that, plaintiffs

have not provided evidence from which a reasonable jury could conclude that defendants were on notice that plaintiffs worked through their lunch breaks despite the company's policy. "[T]he FLSA stops short of requiring the employer to pay for work it did not know about, and had no reason to know about." *Keller v. Summit Seating, Inc.*, 664 F.3d 169, 177 (7th Cir. 2011).

Plaintiffs' complaint included numerous allegations regarding the requirement that they purchase uniforms, but their brief contains no argument on this topic. The Court concludes that they have abandoned this aspect of their wage claim.

For these reasons, the Court grants summary judgment in favor of defendants on counts twenty-three and twenty-four of plaintiffs' complaint.

## F.    Individual liability

The Court has found that Reed's claims that defendants created a hostile work environment and retaliated against her when she complained survive summary judgment. Defendants argue that neither Kiswani nor Groves can be individually liable on these claims.

Contrary to the arguments in plaintiffs' brief, defendants have not "conceded" individual liability for either defendant. Pls.' Resp. at 16. Moreover, "a supervisor, in his individual capacity, does not fall within Title VII's definition of employer." *Geier v. Medtronic, Inc.*, 99 F.3d 238, 244 (7th Cir. 1996). Neither Kiswani nor Groves can be liable under Title VII.

Section 1981 permits claims both for creation of a racially hostile work environment, *see Yancick*, 653 F.3d at 544 (noting that hostile work environment claims under section 1981 are analyzed "in the same manner as claims brought pursuant to

38

Title VII"), and for retaliation for making a complaint about discrimination. *CBOCS West, Inc. v. Humphries*, 553 U.S. 442 (2008). In contrast to Title VII, an individual may be held liable under section 1981 if he caused or participated in the deprivation. *Smith v. Bray*, 681 F.3d 888, 899 (7th Cir. 2012).

For the reasons the Court has explained, there is no evidence from which a reasonable jury could conclude that Groves exercised authority over Reed's employment status, and thus no reasonable jury could find him liable on Reed's retaliation claim. Groves is alleged, however, to have participated directly in the creation of a hostile work environment, so Reed's claim against him based on that conduct may proceed. In addition, a reasonable jury could find from the evidence that Kiswani caused or participated in the activity alleged to have violated section 1981, both in the alleged improper or inadequate response to her complaint and the alleged retaliatory discharge. For these reasons, the Court grants summary judgment in favor of Groves on Count 12, but not on Count 3, and declines to enter summary judgment in favor of Kiswani on both of those claims.

## Conclusion

For the reasons stated above, the Court grants defendants' motion for summary judgment [docket no. 100] in favor of defendant WSB with respect to all counts except counts three and twelve; in favor of defendant Ibriham Kiswani with respect to all counts except those portions of counts three and twelve that assert a claim under 42 U.S.C. § 1981; and in favor of defendant Glendon Groves with respect to all counts except that portion of count three that asserts a claim under section 1981. The case is set for a status hearing on August 9, 2012 at 9:30 a.m. to set a prompt trial date and discuss the

possibility of settlement.

s/ Matthew F. Kennelly
_____
MATTHEW F. KENNELLY
United States District Judge

Date:  August 2, 2012